**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ALASKA WILDERNESS LEAGUE;
NATURAL RESOURCES DEFENSE
COUNCIL, INC.; PACIFIC
ENVIRONMENT AND RESOURCES
CENTER,
                    *Petitioners,*

            v.

DIRK KEMPTHORNE, et al.,
                    *Respondent,*

SHELL OFFSHORE, INC.,
        *Respondent-Intervenor.*

No. 07-71457

RESISTING ENVIRONMENTAL
DESTRUCTION ON INDIGENOUS LANDS,
A PROJECT OF THE INDIGENOUS
ENVIRONMENTAL NETWORK;
CENTER FOR BIOLOGICAL
DIVERSITY AND SIERRA CLUB,
                    *Petitioners,*

            v.

DIRK KEMPTHORNE, et al.,
                    *Respondent,*

SHELL OFFSHORE, INC.,
        *Respondent-Intervenor.*

No. 07-71989

NORTH SLOPE BOROUGH; ALASKA
ESKIMO WHALING COMMISSION,
                    *Petitioners,*

            v.

DIRK KEMPTHORNE, et al.,
                    *Respondent,*

SHELL OFFSHORE, INC.,
            *Respondent-Intervenor.*

No. 07-72183
DOI No. 2007-152
OPINION

On Petition for Review of a Decision of the
Department of Interior

Argued and Submitted
December 4, 2007—San Francisco, California

Filed November 20, 2008

Before: Dorothy W. Nelson, Stephen Reinhardt, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge D.W. Nelson;
Dissent by Judge Bea

**COUNSEL**

Christopher Winter, Crag Law Center, Portland, Oregon; Deirdre A. McDonnell, Earthjustice, Juneau, Alaska, for the petitioners.

David C. Shilton, United States Department of Justice, Washington, D.C., for the respondent.

Kyle W. Parker, Patton Boggs LLP, Anchorage, Alaska, for the respondent-intervenor.

**OPINION**

D.W. NELSON, Senior Circuit Judge:

Petitioners are six organizations that support environmental conservation, indigenous communities, and wildlife populations of Northern Alaska. They challenge the Minerals Management Service's ("MMS") approval of an exploration plan submitted by Shell Offshore Inc. ("Shell"). Shell seeks to drill multiple offshore exploratory oil wells over a three-year period in the Alaskan Beaufort Sea.

Petitioners challenge the agency's action under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4347, and the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. §§ 1331-56. Petitioners allege that MMS failed to take the requisite "hard look" at the impact of

drilling on the people and wildlife of the Beaufort Sea region in violation of the standards set forth by NEPA, OCSLA, and their implementing regulations. Petitioners also argue that MMS erred by failing to prepare an environmental impact statement ("EIS") for the proposed exploration activities, because of the potential for significant harmful effects on the environment.

We have jurisdiction over all parties' claims as each petition for review was timely filed. We vacate the agency's approval of Shell's exploration plan, and remand so that MMS can conduct the "hard look" analysis required by NEPA.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.  *Administrative Process*

In April 2002, MMS issued a five-year plan establishing a lease sale schedule for the Outer Continental Shelf ("OCS") of the Gulf of Mexico and Alaska. The plan envisions offering three separate lease sales in the Beaufort Sea. In February 2003, MMS prepared a detailed EIS to evaluate the overall impacts of the activities projected to occur pursuant to these lease sales ("multi-sale EIS"). The study analyzes the potential effects of oil exploration and production on the region's wildlife, environment, and subsistence activities. The multi-sale EIS assumes that drilling would begin in 2007, and would require a maximum of two drilling rigs, icebreakers, supply boats, and floating platforms in waters deeper than twenty meters. The multi-sale EIS also evaluates mitigation measures that were developed through the cooperation of federal agencies, the State of Alaska, and Native Alaskans. These measures include an extensive bowhead whale monitoring program and a conflict avoidance process designed to protect subsistence activities. The multi-sale EIS further notes: "Any proposed exploration or development plans that may result for any of the three OCS sales evaluated in this EIS, would

require additional NEPA environmental analysis using site specific information."

In 2003, MMS held the first sale, Lease Sale 186, without conducting further NEPA analysis. The agency held two subsequent lease sales in July 2004 (Lease Sale 195), and August 2006 (Lease Sale 202), preparing a supplemental environmental assessment ("EA") for each one. Both of these EAs "tiered" to the multi-sale EIS. In the tiering process, the agency looks to see if the proposed activities are covered by the analysis in previous studies, whether additional mitigation measures are needed, and what level of NEPA evaluation is required. The leases at issue in this case were purchased in July 2004, under Lease Sale 195.

OCSLA requires that a lessee obtain approval of an exploration plan ("EP") before beginning exploratory drilling. 30 C.F.R. § 250.201. The EP must include a project-specific environmental impact analysis assessing the potential effects of the proposed exploration activities. 30 C.F.R. § 250.227. MMS reviews the EP, and the application is deemed "submitted" when it "fulfills requirements and is sufficiently accurate," and the applicant has "provided all needed additional information." 30 C.F.R. § 250.231(a). MMS then conducts its environmental review pursuant to NEPA, 30 C.F.R. § 250.232(c), and within thirty days issues a decision approving, disapproving, or requiring modifications to the EP. 30 C.F.R. § 250.233.

Shell's proposed drilling activities are the first to be considered for the Beaufort Sea in conjunction with these lease sales. In November 2006, Shell submitted the first version of its EP for the Beaufort Sea region. Shell's EP details its plan to drill up to twelve exploratory wells on twelve lease tracts in the Beaufort Sea over the next three years. The lease blocks are grouped into five "prospects" and stretch from the Colville River Delta eastward to the Canadian border. The Cornell Prospect is fifteen to twenty miles offshore of the Colville

River Delta, north of the Inupiat Eskimo village of Nuiqsut. The Sivulliq Prospect is ten miles offshore in Camden Bay, between the villages of Nuiqsut and Kaktovik. The Olympia Prospect is located north of Kaktovik. The Fosters and Fireclaw Prospects are located farther east, between Kaktovik and the Canadian border.

In the first year of the plan, Shell aims to drill four wells within the Sivulliq Prospect in Camden Bay. In the following two years, "Shell proposes to drill an undetermined number of wells on additional prospects . . . depending on the [initial] drilling results." Throughout this project, Shell plans to use two drilling vessels, two icebreaking ships, various other supply boats, and up to six aircraft. All exploratory activities would occur between June and mid-November as the Beaufort Sea is frozen over for half of the year.

In December 2006, MMS issued its "Completeness Comments" on Shell's EP, indicating what information was still needed before the EP would be considered properly submitted. The agency asked Shell to clarify the specific drilling locations for which it was seeking approval. MMS also sought more information on the "potential impact of underwater noise," conflict avoidance mechanisms, and other mitigation measures that could ameliorate the deleterious effects of the exploratory drilling. The final version of Shell's EP was submitted on January 12, 2007. The application included Shell's Environmental Report and an oil spill contingency plan. No further detail was given identifying specific well locations for the 2008 and 2009 seasons. MMS determined the application was complete and began the approval process on January 17, 2007.

After receiving a completed EP, the agency has thirty days to approve, disapprove, or require modification of a plan. 43 U.S.C. § 1340(c)(1); 30 C.F.R. § 250.233. Throughout this time period, a number of agency experts expressed concern about the potentially significant impacts the drilling would

have on bowhead whales, polar bears, and the Inupiat subsistence harvest.

Despite these concerns, MMS issued an eighty-seven page EA and a Finding of No Significant Impact ("FONSI") on February 15, 2007. The EA "tiers" to the prior environmental studies, pursuant to 40 C.F.R. § 1502.20. The EA states: "The level and types of activities proposed in the Shell EP are within the range of the activities described and evaluated in the Beaufort Sea multiple-sale EIS . . . and updated in EA's [sic] for Sales 195 and 202." The agency concluded that the proposed activities "would not significantly affect the quality of the human environment" or "cause 'undue or serious harm or damage to the human, marine, or coastal environment,' " in accordance with 40 C.F.R. § 1508.27. As a result of this finding, the agency did not prepare an EIS specific to this project.[1]

On April 13, 2007, a group of Petitioners consisting of the Alaska Wilderness League, the National Resources Defense Council, and the Pacific Environment (collectively "AWL"), filed a Petition for Review with this court. Simultaneously, Petitioners representing the North Slope Borough and the Alaska Eskimo Whaling Commission (collectively "NSB") filed an optional administrative appeal from the agency's decision with the Interior Board of Land Appeals ("IBLA"). On May 4, 2007, the IBLA declined to exercise its jurisdiction and stayed the administrative proceedings pending the outcome of AWL's Petition for Review.

---

[1]MMS's approval of the EP was subject to many conditions. Shell had to: (1) obtain a determination from the State of Alaska that its operations were consistent with the Alaska Coastal Management Plan; (2) take measures to avoid conflicts with subsistence harvests; and (3) get approval of its project from both the National Marine Fisheries Service and the Fish and Wildlife Service. The State of Alaska approved Shell's plan on June 19, 2007. Shell reached a conflict avoidance agreement with local whaling captains on July 24, 2007. On July 31, 2007, the Fish and Wildlife Service issued its Letter of Authorization. The National Marine Fisheries Service approved the project on October 25, 2007.

Shell filed a Motion to Intervene on May 14, 2007. On May 15, NSB filed an independent Petition for Review. On May 22, 2007, Resisting Environmental Destruction on Indigenous Lands ("REDOIL"), an organization representing a network of Native Alaskans, filed its Petition for Review and a Motion to Consolidate. This court consolidated the matter on July 2, 2007. On August 14, 2007, this court granted Petitioners' motion to stay, ordering the agency's decision inoperative until this matter could be considered on the merits.

## II.   *Beaufort Sea Resources and Wildlife*

The Alaskan Beaufort Sea is part of the Arctic Ocean, bordering Alaska's north shore. It stretches from Point Barrow and the Chukchi Sea in the west, to the Canadian border in the east. The Beaufort Sea is home to a wide range of fish, mammal, and bird species. The Western Arctic stock of bowhead whales lives within the Beaufort region. Bowhead whales are designated as an endangered species under 50 C.F.R. § 17.11(h). These creatures may live over 100 years and do not reach sexual maturity until fifteen to twenty years. Once they attain maturity, they reproduce roughly every three years. The Western Arctic group migrates twice annually. In the spring, they move eastward from the Bering Strait, through the Alaskan Beaufort Sea, and into summer feeding grounds in the Canadian Beaufort Sea. Most calves are born in the Chukchi Sea prior to entering the Beaufort. During September and October, the whales reverse course and head back to the Bering Strait. The whales spend considerable time feeding in the Alaskan Beaufort during both phases of their migratory pattern.

Bowhead whales are sensitive to noise in the marine environment. The noise generated by icebreakers and drillships has the potential to cause serious consequences for bowhead whales. The impacts of a specific project would vary depending on the placement, quantity, and quality of vessels operating at each site. High levels of underwater noise can cause

temporary or permanent hearing damage. Even low levels of noise can affect the biological functions and behavioral patterns of marine mammals. In particular, increased noise can cause avoidance behaviors that displace migratory routes. Females traveling with young calves may be especially susceptible to harm, as disturbances could separate a dependent from its caregiver.

The Inupiat Eskimos reside on the north coast of Alaska and have long relied upon the resources of the Beaufort Sea and its environs for subsistence. Eight different villages are scattered along the coast. As noted by the multi-sale EIS:

> [T]his close relationship between the spirit of a people, their social organization, and the cultural value of subsistence hunting may be unparalleled when compared with other areas in America where energy development is taking place. The Inupiat's continuing strong dependence on subsistence foods, particularly marine mammals and caribou, creates a unique set of potential effects from onshore and offshore oil exploration and development on the social and cultural system.

Subsistence activities are an important component of the Inupiat's long-term health, as this diet and lifestyle protects against degenerative health risks. Further, as the multi-sale EIS states, "[s]ubsistence activities are assigned the highest cultural values by the Inupiat and provide a sense of identity in addition to being an important economic pursuit."

Bowhead whales are an important subsistence resource for the Inupiat. The harvest of bowhead whales is regulated by the International Whaling Commission, which sets guidelines on the number of whales that can be taken for subsistence purposes. The whale hunt is a dangerous and arduous process for Inupiat whalers, but it produces large amounts of meat consumed by Inupiat communities. Shell's proposed activities

take place in and adjacent to the subsistence bowhead whale hunting grounds for the villagers of both Nuiqsut and Kaktovik. As a result, there is the potential that Shell's activities may disrupt the Inupiat whaling activities.

## STANDARDS OF REVIEW

Review of claims under NEPA and OCSLA are governed by the Administrative Procedure Act, 5 U.S.C. § 706 ("APA"). *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 992 (9th Cir. 2004). "The agency's actions, findings, and conclusions will be set aside if they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " *Id.* (quoting 5 U.S.C. § 706(2)(A)). Our review under the APA is "narrow but searching and careful." *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1065 (9th Cir. 2004) (internal quotation marks omitted). OCSLA further states that an agency's findings, "if supported by substantial evidence on the record considered as a whole, shall be conclusive." 43 U.S.C. § 1349(c)(6).

We review a decision to forego preparation of an environmental impact statement under the arbitrary and capricious standard. *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 730 (9th Cir. 2001). We look to whether the agency has: (1) taken a "hard look" at the potential impact of its actions; (2) considered all of the relevant factors in its decision; and (3) provided an adequate statement of reasons to explain why a project's impacts are insignificant. *Id.* We will not substitute our judgment for that of the agency, but must "engage in a substantial inquiry" and a "thorough, probing, in-depth review." *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415-16 (1971)).

## DISCUSSION

I. *Jurisdiction over NSB and REDOIL's Petitions for Review*

**[1]** This court has jurisdiction over all claims before us. Respondents unsuccessfully argue that NSB and REDOIL's petitions should be dismissed as untimely. OCSLA's jurisdictional provision provides that a petition for review must be filed with the court within sixty days of any contested action. 43 U.S.C. § 1349(c)(3). Respondents assert that the "action" at issue here is MMS's approval of Shell's EP on February 15, 2007. Under this logic, the sixty-day time limit expired on April 16, 2007, and jurisdiction would therefore be barred over the petitions filed by NSB on May 15, 2007, and REDOIL on May 22, 2007.

**[2]** However, since NSB and REDOIL utilized the administrative appeal process, the sixty-day deadline did not begin to run on February 15, 2007. NSB and REDOIL filed an optional appeal of the agency's decision with the IBLA on April 13, 2007, pursuant to 30 C.F.R. § 290.2. This optional appeal was filed within the sixty-day timeline established by 30 C.F.R. § 290.3. On May 4, 2007, the IBLA declined to exercise its jurisdiction and stayed further proceedings pending the outcome of AWL's petition, already filed in this court. The statute of limitations was tolled during the administrative appeal process, and the sixty-day period to file a petition for review began to run after the IBLA issued its decision on May 4.[2] *See ICC v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 284-

---

[2]The IBLA's May 4, 2007, decision "suspended" the administrative proceedings in light of the fact that the IBLA would lose jurisdiction over the appeals when the administrative record was filed with this Court as part of AWL's petition for review. *See* 43 U.S.C. § 1349(c)(7); *see also id.* § 1349(c)(5) ("The Secretary *shall* file in the appropriate court the record . . . .") (emphasis added). The IBLA suspended the proceedings because, at the time of its decision, it did not know whether the adminis-

85 (1987) (holding that a timely petition for administrative review stops the running of the statute of limitations). By filing on May 15 and May 22, the organizations petitioned for review well within the statutory time period.[3]

**[3]** Respondents' argument that tolling does not apply in this context is unavailing. For purposes of judicial review, the filing of an optional administrative appeal renders MMS's February 15, 2007 decision non-final. *See Acura of Bellevue v. Reich*, 90 F.3d 1403, 1407 (9th Cir. 1996) ("We hold that exercise of an optional appeal to a Department ALJ renders the initial Administrator's decision nonfinal for purposes of judicial review under the APA."). The statute of limitations was tolled while the administrative appeal was pending. *See, e.g.*, *Bhd. of Locomotive Eng'rs*, 482 U.S. at 284-85.

Respondents assert that the Supreme Court's decision in *Stone v. INS*, 514 U.S. 386 (1995), limits the availability of tolling in this context. To the contrary, *Stone* in fact reiterates the strength of the "conventional tolling rule" during administrative appeals. 514 U.S. at 391-92, 398. That case dealt with

---

trative record had already been filed by MMS or when it would be filed. Thus, it lacked the information necessary to dismiss the appeals for lack of jurisdiction. Nonetheless, the IBLA's May 4, 2007, decision was "final" because it effectively terminated the appeals: the IBLA could not reopen the appeals after the filing of the administrative record divested the IBLA of jurisdiction because, under § 1349(c)(7), the decision issued by this Court would be "final."

[3]The dissent ignores *Brotherhood of Locomotive Engineers* in suggesting that the sixty-day time limit ran during the period between the Secretary's decision and the filing of the administrative appeals and that NSB and REDOIL thus had only three days to file their petitions for review upon completion of the IBLA proceedings. Under *Brotherhood of Locomotive Engineers*, the statutory time limit does not begin to run until the administrative appeal is terminated. *See* 482 U.S. at 276 (considering only whether the petition for administrative review was filed "within the period prescribed by" the agency's rules).

a very specific jurisdictional provision in the Immigration and Nationality Act ("INA"). The statute stated:

> [W]henever a petitioner seeks review of an order under this section, any review sought with respect to a motion to reopen or reconsider such an order shall be consolidated with the review of the order.

8 U.S.C. § 1105a(a)(6) (1988) (current version at 8 U.S.C. § 1252(b)(6) (2005)). The Court examined the statutory language and the legislative history to conclude that the "statute is best understood as reflecting an intent on the part of Congress that deportation orders are to be reviewed in a timely fashion after issuance, irrespective of the later filing of a motion to reopen or reconsider." *Stone*, 514 U.S. at 394. The Court deviated from the general tolling principle because of specific indications from Congress that it intended such a result. *Id.* at 393 ("Congress chose to depart from the ordinary judicial treatment of agency orders under reconsideration"); *see also id.* at 398 (this provision "is best understood as reflecting [Congress's] expectation that in the particular context of INS deportation orders the normal tolling rule will not apply.").

The jurisdictional statute in OCSLA is not analogous to the INA statute at issue in *Stone*. The statute in *Stone* directly addressed the relationship between judicial review and agency reconsideration. *See* 8 U.S.C. § 1105a(a)(6) (1988). OCSLA's jurisdictional provision uses standard language that does not suggest any intent to diverge from general tolling principles. *See* 43 U.S.C. § 1349. The statute generically states that petitions for review must be filed "within sixty days after the date of such action." *Id.* § 1349(c)(3). There is no indication here that Congress intended to depart from established tolling principles. Additionally, permitting tolling does not frustrate the prompt implementation of MMS action. The regulations provide that the agency's decisions remain in effect during an administrative appeal, unless a stay is granted. 30 C.F.R.

§ 290.7(a). MMS decisions can therefore have immediate effect, unless a reviewing body has legitimate reason to grant a stay.

[4] The dissent erroneously argues that 43 U.S.C. § 1349(c) prohibits any internal administrative appeal of the Secretary's decision to approve an exploration plan. However, that section prohibits only other forms of *judicial* review and is silent as to *administrative* review. Sections (c)(1) through (c)(3) by their own terms apply only to "judicial review," and sections (c)(5) through (c)(7) establish rules for that judicial review. The only possible basis for the dissent's conclusion is section (c)(4), which provides that "[a]ny action of the Secretary specified in paragraph (1) or (2) shall only be subject to review pursuant to the provisions of this subsection, and shall be excluded from citizen suits which are permitted pursuant to subsection (a) of this section." *Id.* Notably, the latter half of § 1349(c)(4), like the remainder of § 1349(c), is concerned exclusively with judicial review. In this statutory context, it is clear that, just like every other provision of § 1349(c), the "review" covered by the first half of § 1349(c)(4) is *judicial* review: Section 1349(c)(4) simply preempts other statutory avenues for judicial review, such as the Administrative Procedure Act. Because § 1349(c) is silent as to the availability or timing of administrative review, general principles of administrative tolling, as exemplified in *Brotherhood of Locomotive Engineers*, apply, and the sixty-day deadline did not begin to run until the IBLA issued its decision on May 4, 2007.

[5] NSB and REDOIL did not relinquish their opportunity for judicial review by opting to file an administrative appeal first. The statute of limitations was tolled during the appeal process, and petitions for review were filed well within sixty days after the IBLA issued its order. Accordingly, we have jurisdiction over all parties.

II.  *Compliance With NEPA "Hard Look" Review*

A.  *Statutory Background*

OCSLA provides for a four-stage process for oil and gas development, with NEPA review at each stage. *See Sec'y of the Interior v. California*, 464 U.S. 312, 337 (1984) (delineating the "four distinct statutory stages to developing an offshore well," each requiring "separate regulatory review"). The process involves: (1) preparation of a lease-sale schedule; (2) lease sales; (3) exploration of the lease-sale area; and (4) development and production. *Id.* The continuing review process allows an agency to adjust its analysis to make sure energy production activities are conducted in an environmentally sound manner. The case before us involves exploration, the third stage of the process. At this phase, a lessee submits an EP for review and approval. 43 U.S.C. § 1340(c). The agency has thirty days to review the EP. *Id.* § 1340(c)(1). The agency must disapprove the plan if it would result in "serious harm or damage" to the marine, coastal, or human environment. *See* 43 U.S.C. § 1334(a)(2)(A)(i).

As noted by the Supreme Court, "NEPA declares a broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989). NEPA ensures that an agency "will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Id.* at 349.

NEPA requires that, "to the fullest extent possible," all federal agencies shall prepare an EIS when considering proposed activities "significantly affecting the quality of the human environment." 42 U.S.C. § 4332; *Robertson*, 490 U.S. at 348; *see also Blue Mountains Biodiversity Project v. Blackwood*,

161 F.3d 1208, 1212 (9th Cir. 1998) (threshold question in NEPA challenge is "whether a proposed project will 'significantly affect' the environment, thereby triggering the requirement for an EIS" (quoting 42 U.S.C. § 4332(2)(C)). An agency may first prepare a less exhaustive EA to determine whether an EIS is necessary. 40 C.F.R. § 1508.9; *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 730 (9th Cir. 2001). An EA is a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS] or a [FONSI]." 40 C.F.R. § 1508.9(a). "Because the very important decision whether to prepare an EIS is based solely on the EA, the EA is fundamental to the decision-making process." *Metcalf v. Daley*, 214 F.3d 1135, 1143 (9th Cir. 2000). An EA is sufficient if it provides enough "evidence and analysis for determining whether to prepare an [EIS] or a [FONSI]." *Anderson v. Evans*, 371 F.3d 475, 488 (9th Cir. 2004). Federal regulations encourage agencies to tier their environmental analyses in order to streamline and focus the review process. 40 C.F.R. § 1502.20 ("Whenever a broad [EIS] has been prepared . . . the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the subsequent action.").

**[6]** "[A]n EIS *must* be prepared if 'substantial questions are raised as to whether a project . . . *may* cause significant degradation of some human environmental factor.' " *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1149 (9th Cir. 1998) (quoting *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1332 (9th Cir. 1992)). If an agency finds an EIS is not required and issues a FONSI, it must provide a "convincing statement of reasons" to explain its decision. *Blue Mountains*, 161 F.3d at 1212; *see also* 40 C.F.R. §§ 1501.4(e), 1508.13. An agency cannot rely on mere "conclusory assertions that an activity will have only an insignificant impact on the environment." *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d

846, 864 (9th Cir. 2005). Rather, the agency must demonstrate that it took the requisite "hard look" at the potential environmental impacts of a project, thereby justifying its action. *Blue Mountains*, 161 F.3d at 1212*; Ocean Advocates,* 402 F.3d at 864; *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1066-67 (9th Cir. 2002).

To provide guidance on how NEPA should be applied, the Council on Environmental Quality promulgated regulations explaining what factors an agency must consider in determining if a project's potential effects are "significant." *See* 40 C.F.R. § 1508.27. This requires "considerations of both context and intensity." *Id.* Context refers to the location and interests that would be affected by the proposed action. *Id.* § 1508.27(a). Intensity refers to "the severity of the impact." *Id.* § 1508.27(b). In considering intensity, an agency should consider up to ten factors that shed light on the "significance" of a project. *Id.* Those factors include: the effect on public health and safety; the unique characteristics of the geographic area; the degree to which the effects on the quality of the human environment are likely to be highly controversial; the degree to which the possible effects are highly uncertain or involve unknown risks; and the possible impacts on an endangered or threatened species. *Id.* §§ 1508.27(b)(2), (3), (4), (5), (7).

B.    *Sufficiency of MMS's Environmental Analysis*

MMS has not provided a convincing statement of reasons explaining why Shell's exploratory drilling plans at these *specific* sites would have an insignificant impact on bowhead whales and Inupiat subsistence activities. As a result, we are unpersuaded that MMS took the requisite "hard look" at the environmental impact of this project. There remain substantial questions as to whether Shell's plan may cause significant harm to the people and wildlife of the Beaufort Sea region.

Respondents' primary response is that, through the tiering process, the agency sufficiently analyzed all possible environ-

mental impacts of this project. The EA is "tiered" to the multi-sale EIS and the EAs for Lease Sales 195 and 202 pursuant to 40 C.F.R. § 1502.20. According to Respondents, any analysis that is allegedly missing from the EA is adequately covered in those previous documents. Respondents point out that OCSLA only allows thirty days to approve an EP, *see* 43 U.S.C. § 1340(c)(1), and argue that this short statutory deadline encourages a streamlined review process. The agency may not, however, hide behind the cloak of its generalized multi-sale EIS. NEPA applies to all stages of the OCSLA cycle. *Vill. of False Pass v. Clark*, 733 F.2d 605, 614 (9th Cir. 1984). When the agency is tasked with assessing the environmental impacts of a particular exploration plan, it has a duty to take a hard look at the consequences of drilling in specific sites. As the agency itself noted in the multi-sale EIS, "[a]ny proposed exploration or development plans that may result for [the area] evaluated in this EIS, would require additional NEPA environmental analysis using site specific information." MMS's environmental analysis is inadequate because it fails to consider the impacts this specific project will have on bowhead whales and Inupiat subsistence activities.

### 1. *Impacts on Bowhead Whales*

MMS's EA fails to take a hard look at whether Shell's exploratory drilling program would have a "significant" effect on bowhead whales, an endangered species. *See* 40 C.F.R. § 1508.27(b)(9) (agency should consider "degree to which the action may adversely affect an endangered or threatened species"). The EA lacks sufficient analysis on the consequences of underwater noise and its impact on bowheads' migratory routes. Although the presence of some negative effects does not mandate a finding of significant impact, the agency must "consider the degree of adverse effect on a species." *Env't Protection Info. Center (EPIC) v. U.S. Forest Serv.*, 451 F.3d 1005, 1010-11 (9th Cir. 2006); *see also Native Ecosystems Council*, 428 F.3d at 1240-41 (any mention of an adverse

impact does not necessarily compel an EIS, but an agency should not use a "soft touch or brush-off of negative effects").

[7] The major shortcoming of the agency's environmental analysis is that it does not assess the impacts that would be felt by the bowhead whale population from a project in the migratory route that involves two drillships and two icebreakers. The multi-sale EIS envisions "[a] maximum of two drilling rigs" would be used during this time, and the EA "assumed that two drilling rigs with icebreaker support might operate during any year." However, aside from nominally mentioning the possible extent of this project, the studies relied upon by the agency do not actually assess the potential significance of underwater noise from a drilling operation of this scope.

[8] The multi-sale EIS discusses, in a general sense, the impact of noise on bowhead whales, citing a number of studies that have been conducted on the topic. However, that document contains no studies that analyze the effects of noise from a project with two drillships and two icebreakers. The studies assessing the effect of noise in other situations suggest that bowheads respond to drilling noise by altering their migration speed and swimming direction to avoid closely approaching the noise sources. In discussing icebreaker noise, the multi-sale EIS states, "[e]ffects of an actual icebreaker on migrating bowheads, especially mothers and calves, could be biologically significant." Moreover, studies cited in the multi-sale EIS use varying methodologies and come to inconclusive results. Many of these reports use noise simulations, but there is limited data on how bowheads would respond in an uncontrolled setting. The reports state: "There are no observations of bowhead reactions to icebreakers breaking ice," and "playback results may somewhat understate the differences between truly undisturbed whales versus those exposed to playbacks." The generalized information contained in the multi-sale EIS does not adequately demonstrate that the agency has taken a hard look at the effects of Shell's project

on bowhead whales. After making the observation that noise could cause significant biological effects, there is not additional information that supports why any specific project would not cause real harm to whale populations. In particular, it is not evident from the multi-sale EIS that a project using the type of equipment proposed by Shell would not have a significant impact on bowhead whales.

The EA does not cure this infirmity. The EA gives only a brief description of the level of noise the individual drillships in Shell's proposal could make, but does not examine the combined effect of all vessels operating simultaneously. The agency's analysis relies in large part on a biological opinion ("BiOp") prepared by the National Marine Fisheries Service ("NMFS") in 2006. MMS asserts that the BiOp "covers the proposed Shell operations" because it assumed a situation where two drilling rigs with icebreaker support would operate in an area covering up to twelve wells. But there is no indication that the BiOp in fact relies on studies involving two drillships and two icebreakers. The BiOp acknowledges that the "potential total adverse effects of long-term added noise, disturbance, and related avoidance of feeding and resting habitat . . . are unknown." In addition, "[t]here has been no documented evidence that noise from previous OCS operations has served as a barrier to migration," but "[c]oncentrations of loud noise and disturbance activities during the open water period have the potential to cause large numbers of bowheads to avoid using areas for resting and feeding for long periods of time . . . while the noise producing activities continue." This analysis indicates that there are serious concerns and uncertainties about the manner in which the endangered bowhead population would respond to Shell's three year exploratory drilling plan. Despite these concerns, the BiOp goes on to allege that "bowhead whales exposed to noise-producing activities . . . most likely would experience temporary, nonlethal effects." It comes to the conclusion that "such exploratory drilling would not jeopardize the population." This determina-

tion is not supported by the BiOp's contrary assertions that noise could cause serious adverse effects.

MMS realizes the distinguishing characteristics between Shell's specific proposal and the scope of prior studies, but does not then engage in any additional analysis. The agency admits in the EA that, "in the past, operations with one drill ship and associated icebreakers have displaced the migration slightly, and no whales were sighted between the operations and shore, but it is unknown what the increased level of effect of two proposed drillships and associated icebreakers and other attendant vessels would be." In MMS's own review of a 1993 monitoring study, the agency notes that the report "detected behavioral changes in bowheads around drillship operations near Camden Bay." MMS goes on to state:

> With regards to the MMS significance criteria, there is no evidence that the offshore displacement . . . persisted for more than a generation (about 17 years). So, the level of effect of a drillship in Camden Bay is probably not significant by MMS NEPA standards. However, the same type of displacement to the east of Kaktovik where whales frequently feed would affect growth and could have a more serious biological effect. Also, even though there isn't a significant biological effect from in Camden Bay operations, there could be a significant sociocultural effect if the bowheads do not migrate back into the shoreward portion of the migration corridor as they approach Cross Island.

Notably, the EA also states that the "effect on bowheads is likely to be greater than for [the 1993 activities] because of Shell's proposal to use two drillships, two large icebreakers, and several associated vessels." Although the agency mentions the possibility for increased impacts on bowhead whales and the human populations who depend on them, it fails to

take a hard look at whether a proposal of this magnitude will have significant impacts on this endangered species.

The agency's attempt to rely upon a monitoring program as a mitigation measure is similarly ill-founded. This section of the EA ends with a discussion of "Stipulation No. 4" which requires that Shell conduct a site-specific whale monitoring program during its drilling operations. Instead of insisting on alternative mitigation measures or conducting a full EIS at this time, MMS states it "has the authority to modify approved operations to ensure that significant biological populations or habitats deserving protection are not subject to a threat of serious, irreparable, or immediate harm."

[9] Federal regulations define "mitigation" as a way to avoid, minimize, rectify, or compensate for the impact of a potentially harmful action. 40 C.F.R. §§ 1508.20(a)-(e). An agency can rely upon mitigation measures in determining whether an environmental impact is significant. *See Nat'l Parks & Conservation Ass'n*, 241 F.3d at 734. In order to be effective, a mitigation measure must be supported by analytical data demonstrating why it will "constitute an adequate buffer against the negative impacts that may result from the authorized activity." *Id.* A mitigation measure must render potential impacts "so minor as to not warrant an EIS." *Id.* The proposed monitoring program fails this test, as it could detect impacts only after they have occurred. MMS's statement that it would reserve the authority to modify approved operations does not provide enough protection under this standard. A court must be able to review, in advance, how specific measures will bring projects into compliance with environmental standards. *See id.* at 733 ("The Parks Service proposes to increase the risk of harm to the environment and then perform its studies. . . . This approach has the process exactly backwards."). Monitoring may serve to confirm the appropriateness of a mitigation measure, but that does not make it an adequate mitigation measure in itself. *See EPIC*, 451 F.3d at 1015-16.

**[10]** After considering the gaps in the multi-sale EIS and the EA, we conclude that the agency failed to take a "hard look" under NEPA because it did not provide a well-reasoned analysis of site-specific impacts to the endangered bowhead whale population. The tiered OCSLA process allows general analysis at the lease-sale stage, but the agency must then consider site-specific impacts before approving an individual exploration plan. *See Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 784 (9th Cir. 2006) (holding that agency could not rely on "vague prior programmatic statements," but needed to consider "site-specific impacts" when a "critical decision has been made to act" on a lease sale); *Vill. of False Pass v. Watt*, 565 F. Supp. 1123, 1135 (D. Alaska 1983) ("[A] purpose of OCSLA is to permit an expedient resolution of preliminary matters in the development of oil lands while preserving administrative and judicial review for future times when potential threats to the environment are readily visualized and evaluated.").

As the agency itself notes in the multi-sale EIS, the tiered approach "builds on the premise that as both the agencies and companies involved move from general planning, to leasing, to exploration . . . the specificity of the information improves. The accompanying environmental analysis that flows from each stage also is more specific with respect to location, timing, and magnitude." The EA contains the names of Shell's drilling vessels (the *Kulluk* and the *Frontier Discoverer*) and icebreakers (the *Kapitan Dranitzyn* and the *Vladimire Ignatyuk*), and mentions the other vessels Shell intends to use. However, merely noting the details of Shell's EP does not demonstrate that the effects of this plan were actually analyzed. The results of the studies in the multi-sale EIS and EA were inconclusive. The agency may not rely on past studies on the general impact of noise on bowhead whales to justify its failure to conduct a particularized assessment here. This is especially true when past studies acknowledged that noise levels may, in certain circumstances, cause significant disturbances to whales. Additionally, MMS's analysis should take

a closer look at the locations of Shell's individual wells in relationship to the migratory patterns of the bowhead whales.

**[11]** In sum, MMS abrogated its NEPA duties because neither the EA nor the documents it tiers to considers the specific parameters and potential dangers of Shell's project. There is substantial uncertainty about how various levels of noise would affect whales and their migratory patterns. *See* 40 C.F.R. §§ 1508.27(b)(5), (9) (in its review, agency should consider degree to which possible effects to the environment are highly uncertain, as well as how action may adversely affect an endangered species). Furthermore, the proposed mitigation measure does not save the plan because it is not clear that a monitoring program will ameliorate potentially serious negative impacts. *See Nat'l Parks & Conservation Ass'n*, 241 F.3d at 734.

### 2. *Impacts on Inupiat Subsistence Activities*

#### i. *Bowhead Whale Harvest*

**[12]** MMS also failed to take a "hard look" at the effects Shell's project would have on the Inupiat's subsistence uses of bowhead whales. The agency's review should consider how the proposal affects public health or safety, and the degree to which its impact on the human environment is unknown or highly controversial. 40 C.F.R. §§ 1508.27(b)(2), (4), (5). MMS defines a "significant" effect on a sociocultural system as: "A chronic disruption of sociocultural systems that occurs for a period of 2-5 years, with a tendency toward the displacement of existing social patterns."

**[13]** As discussed above, MMS did not adequately evaluate the consequences of drilling in these specific locations on bowhead whale populations. That same analysis applies to the effect the drilling plan will have on the bowhead whale harvest and the important role this tradition plays in Inupiat culture. MMS's failure to consider the parameters of Shell's plan

results in an inadequate analysis of the impacts of this proposal on communities that rely on bowhead whales for subsistence. The EA itself notes that even if underwater noise does not cause a significant biological effect for the whales themselves, "there could be a significant sociocultural effect if the bowheads do not migrate back" into the "migration corridor." MMS acknowledges this possibility, but then comes to the inexplicable conclusion that this project can proceed without other modifications. The agency further states that "ideally, drilling and high resolution seismic activity would not deflect whales until . . . whalers had harvested whales," but does not give any rationale explaining why it expects this ideal scenario will occur. The EA itself admits that "it is unknown what the increased level of effect of two proposed drillships and associated icebreakers and other attendant vessels would be."

[14] Without examining the possible level of disruption to the Inupiat harvest of bowhead whales, MMS offers only "conclusory assertions" that impacts will not be significant. *See Ocean Advocates*, 402 F.3d at 864-66 (holding that Army Corps of Engineers failed to take "hard look" where its assessment included only conclusory assertions and did not discuss contrary evidence). Accordingly, Petitioners correctly posit that the agency must conduct greater analysis of how Shell's activities in these particular locations, using two drillships and two icebreakers, will affect the Inupiat's reliance on the bowhead harvest.

MMS asserts that any threat to the Inupiat's subsistence whaling would be minimized through a conflict avoidance agreement. Again, the deficiencies in the agency's analysis are not cured through its proposed mitigation measure. In order to rely on mitigation to obviate further analysis, the measure must be identified and its effectiveness analyzed. *Nat'l Parks & Conservation Ass'n*, 241 F.3d at 733-36 (holding EIS must be prepared where monitoring and mitigation measures were uncertain). Additionally, "[m]itigation must be

discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998) (internal quotation marks and citation omitted). The agency must provide analytic data on the efficacy of a proposed measure, and the court must decide whether it "will render such impacts so minor as to not warrant an EIS." *Nat'l Parks & Conservation Ass'n*, 241 F.3d at 734.

**[15]** The conflict avoidance agreement process is too vague and uncertain as a mitigation measure to justify the agency's decision not to engage in further analysis. Conflict avoidance agreements come about through a voluntary process and are renegotiated every year. The agency is not party to the process, and any agreement made is not legally binding. The EA itself notes that without an agreement, there are serious questions about whether the project would have significant impacts on Inupiat communities. The agency states: "Without such conflict avoidance measures in place, significant impacts to the subsistence resources and hunts for bowhead whales, seals, and polar bears could occur." It goes on to say: "Only a carefully constructed and monitored [conflict avoidance agreement] could produce some remedy to disturbances to bowhead whales and the subsistence hunt." The language used by MMS reveals the real risks this project poses to the bowhead population and Inupiat communities. An annual voluntary re-negotiation process does not sufficiently mitigate the concerns raised by Petitioners and acknowledged by the agency.

**[16]** Simply because conflict avoidance agreements have been used effectively in the past does not mean that an agency can rely on them to cure inadequacies in the environmental assessment.[4] MMS abdicates its responsibility for analyzing

---

[4]Before drilling operations were stayed by this court in August 2007, Shell and the local whaling captains negotiated a year-long agreement that would have deferred drilling operations until after completion of the Nuiqsut whale hunt.

the effects on subsistence whaling by leaving it up to the parties to come up with their own agreement, outside of the NEPA review process. MMS does provide that, if the parties fail to reach an agreement, MMS may re-examine the situation and make a "final determination on the adequacy of the measures taken to prevent unreasonable conflicts with subsistence harvests." However, this provision is not sufficient to meet the agency's obligations. There is still no analytical data that shows how the process would reduce the impact to whaling below the level of significance. *See Nat'l Parks & Conservation Ass'n*, 241 F.3d at 734 (citing *Idaho Sporting Congress*, 137 F.3d at 1151). By relying on the uncertain outcome of the conflict avoidance agreement process, the agency deprives this court of its ability to review whether the measure is sufficiently protective. In sum, the agency is not relieved of its responsibility to conduct more specific analysis on how this project will affect the Inupiat harvest of bowhead whales.

### ii.   *Other Subsistence Activities*

Shell's activities will also affect other Inupiat subsistence resources, such as beluga whales, caribou, and fish. Petitioners urge the agency to take a closer look at the impacts of exploration because of the proximity of the proposed activities to the Inupiat hunting and fishing grounds. The EA's comments focus almost entirely on the subsistence use of bowhead whales. It notes only in one sentence that "helicopter and aircraft supply flights have the potential to disturb caribou movements and alter the subsistence hunt." The multi-sale EIS takes a cursory glance at these other animal populations, stating that drilling activities "could affect the availability of" beluga whales to subsistence hunters. The study further acknowledges that flight activity may disturb caribou populations.[5]

---

[5]In a separate agreement, Shell has agreed to keep helicopter traffic above 1,500 feet to minimize any interference with the caribou hunt.

The biggest gap in the agency's multi-sale EIS and EA is the lack of both information and analysis examining the impacts this project will have on fish populations. In analyzing fish populations, the EA acknowledges: "Given scientific uncertainty surrounding how several important fish species would react to varying levels of drilling program noise, we believe it possible there will be more than a minimal level of effect on some species." MMS acknowledges that it "cannot concur" with Shell's assurances that its activities "may have minimal to no impact on fish." The agency goes on to state:

> The MMS also cannot concur that the effects on all fish species would be 'short term' or that these potential effects are insignificant, nor would they be limited to the '. . . localized displacement of fish . . .', because they could persist for up to five months each year for three consecutive years and they could occur during critical times in the life cycle of important fish species.

> The MMS remains concerned that the potential adverse effects described for several fish species will occur to an unknown degree, however none are expected to exceed the level that would require three generations to recover (the threshold for a significant effect).

After this lengthy discussion on concerns and gaps in the data, the EA's abrupt conclusion that any potential effects will be insignificant is unsubstantiated. This is the type of "conclusory assertion" that is disfavored by this court because the agency has not provided any scientific data that justifies this position. *See Ocean Advocates*, 402 F.3d at 864.

The EA notes that it does not have the data to examine the full effect of underwater noise on fish movement. When information necessary to determine the effects is readily available or easily gathered, the law requires that an agency gather such

information. *See Nat'l Parks & Conservation Ass'n*, 241 F.3d at 733 (stating agency's "lack of knowledge does not excuse the preparation of an EIS; rather it requires the [agency] to do the necessary work to obtain it."). Here, MMS has not shown that this information is unattainable. If data on the impacts of fish is not readily available, then the agency must give a more complete explanation of how, in light of those gaps, it still believes this project would not cause a significant impact on fish and the communities that consume them.

The EA ultimately concludes that Inupiat communities may suffer cultural consequences from drilling activities, but does not state whether these effects will be "significant." Instead, the EA relies on mitigation measures in the hopes that they would ameliorate any harm done: "Required mitigation, monitoring, and conflict avoidance measures . . . would serve collectively to mitigate disturbance effects on Native lifestyles and subsistence practices and likely would mitigate any consequent impacts on sociocultural systems." As discussed above, these mitigation measures do not go far enough to rectify the potential that Shell's project will cause substantial harm to Inupiat communities on Alaska's northern shore.

**[17]** In sum, MMS failed to take a "hard look" at the impacts this plan will have on Inupiat subsistence activities. The agency notes the gaps in its data and the potential for serious consequences, but then comes to the unsubstantiated conclusion that any impacts will be insignificant. The agency's broad assertions are not supported by the record. *See EPIC*, 451 F.3d at 1009 (agency must consider all relevant factors and provide a convincing statement of reasons to justify its decision). Accordingly, MMS should create either a revised environmental analysis or, as necessary, an environmental impact statement, taking a closer look at how Shell's drilling in these specific sites will affect Inupiat subsistence activities.

3. *Impacts of Potential Crude Oil Spills*

**[18]** Despite any other insufficiencies, MMS's environmental analysis does adequately examine the impacts of a potential crude oil spill. The EA states, "[f]or purposes of this EA analysis, no crude oil spills are assumed from exploration activities. This assumption is based on the low rate of exploratory drilling blowouts per well drilled and the history of exploration spills on the Arctic OCS . . . ." Petitioners contend that this assumption is erroneous, and the agency must consider the likelihood of a spill in relationship to the harm such an event would cause. This argument is unavailing. The agency's assessment makes the proper inquiry into the risk of an oil spill, and no further analysis is required in relationship to this exploration plan.

In the process of NEPA review, an agency should consider the "degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks." 40 C.F.R. § 1508.27(b)(5). NEPA does not require consideration of risks that are "merely speculative" or "infinitesimal." *No GWEN Alliance v. Aldridge*, 855 F.2d 1380, 1386 (9th Cir. 1988); *Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of the Navy*, 383 F.3d 1082, 1090 (9th Cir. 2004). An agency should assess the likelihood of a particular risk along with the consequences of such an accident. *See City of New York v. U.S. Dep't of Transp.*, 715 F.2d 732, 746 (9th Cir. 1983) ("It is only the risk of accident that might render the proposed action environmentally significant. That circumstance obliges the agency to undertake risk assessment: an estimate of both the consequences that might occur and the probability of their occurrence.").

Despite its initial assumption that an oil spill will not occur, the EA includes discussion of the effects of a potential spill on the Inupiat subsistence harvest and a variety of animal species. The EA also incorporates the multi-sale EIS's extensive discussion of a potential spill. The multi-sale EIS recognizes

that "[a] very large oil spill is an issue of concern to everyone. . . . A very large oil spill is a low-probability event with the potential for very high effects." The EIS analyzes data from spills around the world, since very large spills in U.S. waters have been extremely rare. The document further considers the potential effects of "small" and "large" oil spills in the Beaufort Sea region. Appended to the multi-sale EIS is a lengthy document entitled "The Information, Models and Assumptions We Use to Analyze the Effects of Oil Spills in this EIS." This report includes information on the history and behavior of spilled oil. In evaluating the risks of an oil spill, the agency has, over time, conducted extensive studies on the likelihood of oil spills in the Beaufort Sea. These include the 2002 and 2006 Bercha Reports on the "Alternative Oil Spill Occurrence Estimators and their Variability for the Beaufort and Chukchi Seas." The analysis of oil spill risks was updated in the EAs for both Lease Sale 195 and Lease Sale 202. There is no indication that the agency erred in relying on these documents in its review of this specific project.

Petitioners argue that extensive discussion of spills in MMS's prior analyses and the requirement that an oil response plan be prepared is evidence that an oil spill is a reasonably foreseeable event. Under their logic, the EA should therefore have included analysis on the possibility of such a spill. Petitioners support this contention by citing to cases where an agency was required to consider even remote risks that could cause great harm. *See, e.g.*, *San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n*, 449 F.3d 1016, 1030-31 (9th Cir. 2006) (holding that agency was unreasonable in categorically dismissing the possibility of a terrorist attack as "too remote and highly speculative" to warrant NEPA consideration). Petitioners also point out that, even if an oil spill is unlikely, the consequences could be great. Petitioners contend that the EA's blanket "assumption" failed to adequately consider the relationship between the risk and the consequences of an oil spill.

Petitioners' position on this issue is flawed. The EA properly tiers to the lengthy discussion of the risk and impacts of oil spills in the multi-sale EIS. This case may be distinguished from *San Luis Obispo Mothers for Peace* because here, the agency does not claim it has no obligation to consider this risk, but only that it has sufficiently done so in previous studies. There is no evidence that anything about this particular project requires separate analysis on oil spills. No special risk creates the need for additional evaluation of factors that were not already considered in MMS's prior studies.

Although the language in the EA may not have been ideal, MMS's "assumption" that there would not be an oil spill was supplemented with comprehensive studies on the likelihood and impact of such an event. Accordingly, the agency did not act arbitrarily and capriciously in its assessment of the potential effects of an oil spill from this project.

## C.   *Necessity of a Revised EA or an EIS*

MMS has violated NEPA by failing to take a "hard look" at the impacts of Shell's proposal on bowhead whales and Inupiat subsistence activities. MMS has not provided a convincing statement of reasons to justify its decision not to complete an EIS. *See Blue Mountains*, 161 F.3d at 1211.

Moreover, several of the regulatory significance criteria are triggered here. *See* 40 C.F.R. § 1508.27; *Sierra Club v. U.S. Forest Serv.*, 843 F.2d 1190, 1193 (9th Cir. 1988) (holding that an agency's decision not to prepare an EIS was "unreasonable" because record demonstrated that four of the regulatory factors were implicated). Shell's project is located in an increasingly fragile ecosystem and near the Arctic National Wildlife Refuge, an "ecologically critical area" under 40 C.F.R. § 1508.27(b)(3). The contentious nature of the agency's internal communication during the review process demonstrates the controversy surrounding the project. *See id.* § 1508.27(b)(4); *see also Native Ecosystems Council*, 428

F.3d at 1240 (noting that a project is highly controversial if there is a substantial dispute about the effect of an action). As discussed above, the impact of activities at these particular sites poses an unknown risk to bowhead whales and Inupiat subsistence activities. *See id.* § 1508.27(5). The project could also have a serious effect on an endangered species: bowhead whales. *See id.* § 1508.27(b)(9). Finally, there is the potential for cumulatively significant impacts as the project continues through exploration and into the production phase, and the region continues to develop. *See id.* § 1508.27(b)(7).

**[19]** In light of the potential for serious impacts on bowhead whales and Inupiat subsistence activities, the agency erred by not undertaking a more careful analysis before issuing a FONSI. Due to the inadequacies in this particular EA, there is uncertainty over whether the proposed project may have a significant impact. Accordingly we remand to the agency to either prepare a revised EA or, as necessary, an EIS.

The statutory scheme does not preclude a finding that an EIS may be appropriate in these circumstances. MMS argues that the strict timelines in OCSLA indicate that an EIS is not a feasible option at the exploration stage. The agency only has thirty days to approve or disapprove of an exploration plan. 43 U.S.C. § 1340(c)(1). Respondents argue that thirty days is not enough time to generate a full EIS. However, in passing OCSLA, Congress specifically provided that it did not alter an agency's obligations under NEPA. *See* 43 U.S.C. § 1866(a); *see also* 30 C.F.R. § 250.232(c) ("The [agency] will evaluate the environmental impacts of the activities described in your proposed EP and prepare environmental documentation under [NEPA]."). This court has recognized that "NEPA may require an environmental impact statement at each stage: leasing, exploration, and production and development." *Vill. of False Pass v. Clark*, 733 F.2d at 614.

The agency may be correct that it is difficult for an agency to conduct a full EIS in only thirty days, but its argument that

OCSLA precludes such a result is unconvincing. There is flexibility built into the regulatory scheme so that the agency can perform its full duties under NEPA. The thirty-day clock begins to run only when an exploration plan is deemed complete. 30 C.F.R. § 250.233(a). If the agency is able to identify gaps before that point, then it can request that information be added before the proposal is finalized. *See* 30 C.F.R. § 250.231(b). Additionally, at the end of the thirty-day review period, the agency may opt to require modifications to an EP if there are concerns that it does not comport with environmental standards. 30 C.F.R. § 250.233(b). These options give the agency additional time to consider a plan and compile an environmental impact statement, if necessary. To say simply that the agency only has thirty days to complete a full EIS is misleading. Here, since the agency's decision to issue a FONSI without considering the environmental impacts to bowhead whales and subsistence resources was in error, MMS should prepare either a more thorough environmental analysis or an EIS, as necessary, examining the consequences of drilling at these specific locations. *See Metcalf v. Daley*, 214 F.3d 1135, 1146 (9th Cir. 2000).

III. *MMS's Compliance With OCSLA*

[20] The agency's approval of this project also violated OCSLA. OCSLA's implementing regulations require that, when evaluating exploration plans, an agency should consider information about "proposed well location and spacing." 30 C.F.R. § 250.203. Exploration plans must be "project specific" and describe the "resources, conditions, and activities" that could be affected. 30 C.F.R. § 250.227. In particular, an EP must include "[a] map showing the surface location and water depth of each proposed well and the locations of all associated drilling unit anchors." 30 C.F.R. § 250.211(b). Shell submitted the locations of the 2007 drilling sites, but did not specify where it wished to drill in 2008 and 2009. Shell noted that future drilling locations will depend on what is found in the first Sivulliq exploration. Without specific infor-

mation about future well locations, the agency cannot meet its obligation to "review and approve proposed well location and spacing" in accord with 30 C.F.R. § 250.203. As a result, the agency erred by approving an EP for 2007-2009 without knowing where Shell would be drilling for the last two years.

The agency is not saved by regulations that allow MMS to consider the impacts of drilling at subsequent locations when the company requests permits for those specific sites. *See* 30 C.F.R. §§ 250.410-250.418. These regulations stipulate that to obtain approval for a well, the applicant must have "[i]nclude[d] the well in [its] approved Exploration Plan." 30 C.F.R. § 250.410(b). The wells for 2008 and 2009 were not included in Shell's EP. The permit regulations are not an adequate mechanism enabling the agency to check Shell's actions at a later date. MMS also points to 30 C.F.R. § 250.201(c), which enables the agency to relax certain informational requirements when:

> (1) Sufficient applicable information or analysis is readily available to MMS;
>
> (2) Other coastal or marine resources are not present or affected;
>
> (3) Other factors such as technological advances affect information needs; or
>
> (4) Information is not necessary or required for a State to determine consistency with their CZMA Plan.

It is not clear how any of these sections would apply here. To the contrary, having specific information about well locations is critical to the agency's ability to analyze the project's environmental effects. MMS acted in contravention of the regulations by approving Shell's three-year plan without determining the locations of the wells that would be drilled in

that period. In order to comply with the regulations, the agency needs to consider the location of the proposed wells before it can approve the project for all three years.

## CONCLUSION

**[21]** For the foregoing reasons, we VACATE the agency's approval of Shell's exploration plan and REMAND for the agency to prepare a revised EA or, as necessary, an EIS. Shell's motion to lift the stay is DENIED as moot.

## VACATED AND REMANDED.

---

BEA, Circuit Judge, dissenting:

I respectfully dissent on two grounds. First, North Slope Borough and the Alaska Eskimo Whaling Commission ("NSB") and Resisting Environmental Destruction on Indigenous Lands ("REDOIL") filed their petitions for review after the time allowed by the applicable statute of limitations, and neither Congress nor this court provide NSB or REDOIL with an exception to the requirement of timely filing.

Second, because the Minerals Management Service's ("MMS") approval of Shell's exploration plan was neither arbitrary nor capricious, we have no power to overturn the agency action, and the majority's efforts to do so contravene our recent en banc decision in *The Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008).

### *Jurisdiction*

We do not have jurisdiction over NSB and REDOIL's petitions for review because the petitions were filed in this court more than 60 days after the agency action here on review: MMS's approval of Shell Offshore, Inc.'s ("Shell") explora-

tion plan. In their petitions for review, NSB and REDOIL contend MMS failed to consider how Shell's exploration plan would harm some Inupiat subsistence activities: to wit, the Inupiat practice of bowhead whale hunting. We lack jurisdiction over these petitions because it took NSB and REDOIL 96 days to file the petitions they were required by statute to file within 60 days.

At all times relevant here, the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331 *et seq*., provided:

> *Any* action of the Secretary specified in paragraph (1) or (2) *shall only* be subject to review pursuant to the provisions of this subsection . . . .

43 U.S.C. § 1349(c)(4) (emphases added). "This subsection" by which "[a]ny action of the Secretary" may only be reviewed is 43 U.S.C. § 1349(c).

43 U.S.C. § 1349(c)(2) makes clear the statute applies to "[a]ny action of the Secretary[1] to approve . . . any exploration plan . . . ." and that such actions "*shall* be subject to judicial review only in a United States court of appeals for a circuit in which an affected State is located." *Id.* (emphases added). Thus, review under 43 U.S.C. § 1349(c) must be "judicial" in nature, because "any action" by the Secretary to approve an exploration plan "*shall only*" be subject to review pursuant to the mechanisms described in the provisions of 43 U.S.C. § 1349(c)—and those mechanisms are *only* judicial.[2]

---

[1]MMS has the authority to approve exploration plans on behalf of the Secretary of the Interior. *See* 30 C.F.R. § 256.

[2]Contrary to the majority's assertion, 43 U.S.C. § 1349(c) does not mention or even raise the possibility of administrative review. We should not read such review into the statute, particularly when, as here, the statute includes opposing provisions. *See Silvers v. Sony Pictures Ent., Inc.*, 402 F.3d 881, 885 (9th Cir. 2005) (en banc) ("The doctrine of *expressio unius est exclusio alterius* 'as applied to statutory interpretation creates a pre-

Subsection 1349(c)(3) provides that "judicial review . . . shall be available *only* to a person who . . . files a petition for review of the Secretary's action within sixty days after the date of such action. . . ." Accordingly, an MMS order approving an exploration plan, as here, is reviewable "only" in a court of appeals and "only" when the petition for review is filed within 60 days. MMS approved Shell's exploration plan on February 15, 2007. The last day to petition for review of the MMS decision was April 16, 2007, 60 days later. NSB and REDOIL filed their petitions for review in this court on May 22, 2007, and May 25, 2007, respectively.

The majority ignores the plain text of the statute, and instead relies on the fact that on April 13, 2007, before filing their petitions for review in this court, NSB and REDOIL chose to file a purported administrative appeal with the Interior Board of Land Appeals ("IBLA") of MMS's approval order—a filing that is *not* authorized by the relevant statute, 43 U.S.C. § 1349. They purported to do so pursuant to 30 C.F.R. § 290.2.[3] On May 4, 2007, IBLA "suspended" pro-

sumption that when a statute designates certain persons, things, or manners of operation, all omissions should be understood as exclusions.' "). Thus, mention of "judicial review" must be interpreted as the *only* review allowed by statute. To allow administrative review is plainly to amend the statute by judicial writ.

[3]30 C.F.R. § 290.2 provides: "If you are adversely affected by a[n] [MMS] official's final decision or order issued under" the relevant MMS regulations, "you may appeal that decision or order to the Interior Board of Land Appeals." MMS sought dismissal of NSB's and REDOIL's IBLA administrative appeals because federal courts of appeals have exclusive jurisdiction to review the approval of an exploration plan under OCSLA. The majority states that "the IBLA declined to exercise its jurisdiction and stayed the administrative proceedings pending the outcome of" the instant petition for review. Op. at 15560. Actually, the IBLA's order is unclear: the IBLA stated it would have no jurisdiction to hear this matter once the administrative record was filed in this court, but also stated the IBLA would immediately "suspend proceedings . . . pending the outcome of" the instant petition for review. Importantly, the IBLA did *not* decide it *had*

ceedings on the administrative appeal pending the outcome of the instant petition for review.

The majority holds the statutory 60-day filing period was "tolled" during NSB and REDOIL's unauthorized administrative appeal. Accordingly, the majority holds NSB and REDOIL's May 15 and May 22 petitions in this court were timely. The majority holds IBLA's suspension of the administrative appeal pending the outcome of the instant action is a reviewable final agency order and, thus, the 60-day period for NSB and REDOIL to file their petitions for review of MMS's order approving the exploration plan *began* when IBLA suspended the unauthorized administrative appeal.

The majority's use of the word "tolling" here is inventive. The "tolling" the majority applies is different from any known concept of tolling by appeal or equitable tolling, which is perhaps why, as discussed below, the majority cites only inapposite cases. Here, the question is *not* whether the time to file for review of MMS's approval of Shell's exploration plan was

jurisdiction, but prudentially or otherwise decide not to exercise any such jurisdiction. Rather than determine it *had* jurisdiction, it observed it would have *no* jurisdiction upon filing of the record. Note: the IBLA did not say it would *lose* any jurisdiction it might have had. Indeed, it declined to rule one way or the other on the motion challenging its jurisdiction. This is a far cry from "the IBLA declined to exercise its jurisdiction": the only *action* the IBLA took was to take the motions to dismiss and to stay "under advisement."

The only way to interpret the IBLA order, based on its actions as well as its words regarding the motions to dismiss and to stay, is that the IBLA understood it would lose any jurisdiction it had once the appeal was perfected by the filing of the administrative record in this court, and anticipating such filing, stayed proceedings pending the outcome of the instant petition for review. The IBLA was in error. The IBLA never *had* jurisdiction over this matter in the first place, and thus had no valid administrative appeal to stay, because § 1349 provides the courts of appeals with "exclusive" jurisdiction to hear petitions for review of MMS's approval of an exploration plan.

extended by the administrative appeal. Rather, the question is whether the filing of an administrative appeal with IBLA suddenly rendered MMS's approval of the exploration plan, which constitutes a final appealable order, non-final—and, therefore, whether IBLA's later suspension of the administrative appeal was itself a "final agency action" that restarted the 60-day filing clock. *See United States v. Ibarra*, 502 U.S. 1, 4 n.2 (1991) ("[T]he issue is better described as whether the [60]-day period began to run on the date of the first order or on the date of the order denying the motion for reconsideration, rather than as a matter of tolling. Principles of equitable tolling usually dictate that when a time bar has been suspended and then begins to run again upon a later event, the time remaining on the clock is calculated by subtracting from the full limitations period whatever time ran before the clock was stopped.").

Contrary to the majority's assertion, IBLA's suspension of proceedings cannot constitute a "final agency action" because a suspension of proceedings pending the outcome of collateral proceedings is, by definition, not final.[4] *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) ("As a general matter, two conditions must be satisfied for agency action to be 'final': First, the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.' "). Nothing is more interlocutory than a suspension of proceedings—whether in review of an agency action or a divorce decree. Thus, the only

---

[4]Indeed, how can the *suspension* of an appeal at the agency level be a reviewable final agency action? If we determine the suspension was within the agency's discretion, it can be *indefinite* and there will never be an decision! Here, for instance, if no administrative record were filed, the suspension of the appeal would be indefinite. Even a *decision* by the circuit court would not fulfill the regulation's requirement of filing an administrative record to oust agency jurisdiction.

"final" agency action here was MMS's approval of the exploration plan.[5]

Further, the majority's "tolling" theory is inapplicable as a matter of law because, although the Department of the Interior provides a general scheme for administrative appeals of MMS decisions pursuant to 30 C.F.R. § 290.2 (the regulation on which NSB and REDOIL erroneously relied when filing their unauthorized administrative appeal), Congress *expressly restricted* the availability of review for MMS's approval of an *exploration plan* to the court of appeals. *See* 43 U.S.C. § 1349 ("Any action of the Secretary to approve . . . *any exploration plan* . . . under this subchapter shall be subject to judicial review *only* in a United States court of appeals . . . .") (emphasis added). Thus, there *is* no statutory administrative review process during which a court may stay the running of OCSLA's limitations period. NSB and REDOIL simply filed administrative appeals under general agency regulations, and those appeals clashed with a specific statutory prohibition of an appeal other than to a United States Court of Appeals. It should be that simple: the specific congressional statute trumps the general agency regulation. *See Chevron USA, Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.").

Even if "tolling" somehow were to apply, under any recognized tolling theory the statute of limitations would have begun to toll on April 13, 2007, when NSB and REDOIL filed their administrative appeals. On April 13, 2007, only three days remained in the 60-day statutory filing period. Thus, when IBLA suspended NSB and REDOIL's unauthorized

---

[5]The petitioners are not misled. Their opening briefs are clear they petition for review of MMS's approval of the exploration plan, and not IBLA's suspension of their administrative appeal. *See* Opening Br. of AWL and REDOIL at 1; Opening Br. of NSB at 4-5.*

administrative appeal on May 4, 2007, NSB and REDOIL would have had *three days* in which to file timely petitions for review in this court (by May 7, 2007). Their petitions were not filed until May 22, 2007 (REDOIL) and May 25, 2007 (NSB). Thus, the petitions were filed late, even if one accepts the majority's creative "tolling" theory.

To support its tolling theory, the majority opinion relies on cases interpreting the Hobbs Act, 28 U.S.C. §§ 2341-51, to hold the tolling rule applicable under *that* statutory scheme also applies *here*. Cases based on the Hobbs Act, however— including the primary case cited by the majority, *ICC v. Brotherhood of Locomotive Engineers*, 482 U.S. 270 (1987) —are inapposite because: (1) the Hobbs Act simply does not apply to decisions of the Secretary of the Interior, whose authority is delegated to MMS, and (2) the rationale behind Hobbs Act tolling does not apply to a situation like this one.[6]

### 1.   The Hobbs Act does not apply to actions by MMS or the Secretary of the Interior.

Any tolling rule derived from an interpretation of the Hobbs Act is off base because the Hobbs Act does not apply to MMS. The Hobbs Act states "[t]he court of appeals (other than the United States Court of Appeals for the Federal Circuit) has exclusive jurisdiction to enjoin, set aside, suspend

---

[6]I note *Brotherhood of Locomotive Engineers* is inapposite for the additional reason that, in *Brotherhood of Locomotive Engineers*, there was no question the administrative review board had authority to take the administrative appeal. *See* 482 U.S. at 276. The situation here, as discussed, is quite the contrary: the IBLA had no authority whatsoever to take an administrative appeal of an MMS exploration plan.

The majority also cites *Acura of Bellevue v. Reich*, 90 F.3d 1403 (9th Cir. 1996) in support of its "tolling" theory. Unlike *Brotherhood of Locomotive Engineers*, *Acura* is not a Hobbs Act case. However, *Acura* is inapposite because it did not involve a specific statutory provision, as here, that provides the courts of appeals with exclusive jurisdiction to hear petitions for review.

(in whole or in part), or to determine the validity of" final orders from *certain specific* agencies—but not those within Department of the Interior, including MMS. On its face, the Hobbs Act applies only to final orders of: (1) the Federal Communications Commission; (2) the Secretary of Agriculture; (3) the Secretary of Transportation; (4) the Federal Maritime Commission; (5) the Atomic Energy Commission; and (6) the Surface Transportation Board, and also (7) orders under section 812 of the Fair Housing Act. 28 U.S.C. § 2342. In some instances, an agency's organic statutes may refer to the Hobbs Act as the appropriate statute for obtaining judicial review. *See, e.g.*, 8 U.S.C. § 1252(a)(1) (providing for judicial review of final orders of removal of aliens under the Hobbs Act). OCSLA, however, is not such a statute. Instead, OCSLA contains its own provisions for *exclusive* judicial review by the courts of appeals. Thus, a judicially-created tolling rule under the Hobbs Act does not apply to agency action taken by the Secretary of the Interior or MMS under OCSLA.

Here, NSB and REDOIL simply may not have read OCSLA, 43 U.S.C. § 1331 *et seq.*, and filed an administrative appeal under a law that provides for review only by this court. Now they want a free pass. We should not give it to them: "As the saying goes, 'rules is rules.' " *Nat'l Sci. and Tech. Network, Inc. v. FCC*, 397 F.3d 1013, 1014-15 (D.C. Cir. 2005).

### 2.  *The justifications for Hobbs Act "tolling" do not apply here.*

Even were the Hobbs Act applicable to MMS's final order, the underlying rationale for staying the running of the limitations period under the Hobbs Act does not apply to MMS approval of exploration plans under OCSLA. In the Hobbs Act cases, the agencies the court reviewed possessed statutory authority to conduct *administrative* reviews of their orders after the filing of a petition for rehearing or reconsideration with the agency. *See, e.g.*, 49 U.S.C. § 722(c) (granting

administrative powers to review orders of the Department of Transportation); 46 U.S.C. § 304(b) (Federal Maritime Commission); 42 U.S.C. § 2239(b) (Atomic Energy Commission). Hence, in those cases, including those cited by the majority, it was consistent with Congress's stated intent to stay the limitations period for judicial review of actions by those agencies because Congress gave those agencies statutory power and authority to review their own actions before another court did.

In contrast, OCSLA and the organic statutes for the Department of the Interior do *not* provide for Interior or other agency administrative review of MMS decisions. The statutory scheme provides the Secretary of the Interior only with the general authority to "prescribe such rules and regulations as may be necessary to carry out" OCSLA, 43 U.S.C. § 1334, but not to review an MMS order approving an exploration plan. Indeed, as discussed above, the OCSLA provision governing the approval of exploration plans expressly limits review to a petition to the courts of appeal.

Thus, we lack a statutory basis on which to allow tolling for an administrative appeal in the OCSLA context. Further, tolling here violates the clear intent of Congress that the Secretary "*shall* approve" exploration plans within 30 days. The majority's holding that action on exploration plans may be administratively appealed to the IBLA and, thus—probably, almost always—decided over a period of time longer than 30 days, defeats Congress's express desire for rapid approval or denial of exploration plans.[7] The justifications for Hobbs Act tolling simply do not apply to review of an exploration plan approval under OCSLA.

---

[7]Congress stated its intent for OCSLA included "*expedited* exploration and development of the Outer Continental Shelf" and to "insure that the extent of oil and natural gas resources of the Outer Continental Shelf is assessed at the *earliest practicable time*." 43 U.S.C. § 1802(1), (9) (emphases added).

Finally, the Supreme Court has made clear that statutorily imposed times to file a notice of appeal (and, by extension, a petition for review) are jurisdictional and are not subject to equitable exceptions. *See Bowles v. Russell*, 127 S.Ct. 2360 (2007).[8] The majority does not claim there are grounds for equitable exceptions to the 60-day rule. Here, as discussed, we lack any statutory basis for "tolling." Therefore, because OCSLA provides exclusive jurisdiction for review of MMS approval of exploration plans to the courts of appeals, because the Hobbs Act does not apply to petitions for review under OCSLA, and because the justifications for Hobbs Act tolling are not present in the context of this case, we do not have jurisdiction over NSB and REDOIL's untimely petitions.

Our lack of jurisdiction over NSB and REDOIL's untimely petitions narrows the scope of our review because it eliminates from our consideration those issues that were not raised in the timely filed petition of the Alaska Wilderness League, the National Resources Defense Council, and the Pacific Environment (collectively "AWL"). Specifically, we lack jurisdiction over claims that MMS failed to take a "hard look" at the potential impact of Shell's exploration plan on Inupiat subsistence hunting, as AWL did not raise this contention.

We still must determine whether, as AWL did contend, MMS failed to take a "hard look" at the impact of Shell's exploration plan on bowhead whales.

---

[8]"Because Congress decides whether federal courts can hear cases at all, it can also determine when, and under what conditions, federal courts can hear them. . . . Bowles' failure to file his notice of appeal in accordance with the statute therefore deprived the Court of Appeals of jurisdiction. . . . Today we make clear that the timely filing of a notice of appeal in a civil case is a jurisdictional requirement. . . . [T]his Court has no authority to create equitable exceptions to jurisdictional requirements . . . ." *Bowles*, 127 S.Ct. at 2365-66.

### Merits

Under OCSLA, the Secretary of the Interior and, by delegation, MMS, are charged with ensuring the "vital national resource reserve" of the Outer Continental Shelf "be made available for expeditious and orderly development, subject to environmental safeguards." 43 U.S.C. § 1332(3). Under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, the agency must utilize a staged decision-making process that conducts environmental review at each stage of a proposed action's OCSLA review. *See* 40 C.F.R. § 1502.20.

This case comes to us at stage three of NEPA analysis.[9] At this stage, OCSLA requires—prior to lessee Shell commencing exploration of potential oil or natural gas deposits—that such lessee must "submit an exploration plan to the Secretary for approval." 43 U.S.C. § 1340(c)(1). If the Secretary finds the plan is consistent with OCSLA, OCSLA regulations, and the provisions of the lease, the exploration plan "shall be approved" within 30 days of submission. *Id.*

As the majority correctly observes, MMS prepared an initial, 1500-page Environmental Impact Statement that discussed potential environmental effects from development of each of Shell's lease-sale sites ("multi-sale EIS"). MMS then prepared a supplemental, near-100-page Environmental Assessment ("EA") that supplemented the multi-sale EIS for two of Shell's lease plots about which MMS decided additional information was needed. In agency parlance, this supplementing process is called "tiering." "Tiering" means the

---

[9]Stage one is preparation of a lease schedule, stage two is drafting the lease itself, and stage four is development of the lease property. *See Tribal Village of Akutan v. Hodel*, 869 F.2d 1185, 1186 (9th Cir. 1988) (explaining the four stages of NEPA analysis before deferring to the judgment of the Secretary of the Interior as to the adequacy of the environmental studies at issue). The instant petitions for review address stage three alone.

agency bases its later analyses on its initial comprehensive analysis, instead of preparing another 1500 page EIS. Petitioners and the majority do not want MMS to use its extensive prior work to inform its decisions on individual leases, but to prepare a new, self-contained EIS[10] for each lease Shell proposes to explore. This is worse than re-inventing the wheel: this is re-inventing the wheel for *each* wheel of the car.

The process will be expensive, time-consuming, and largely duplicative, which is precisely why NEPA's implementing regulations encourage "tiering" of NEPA documents —to "eliminate repetitive discussion of the same issues and to focus on the actual issues ripe for decision at each level of environmental review." 40 C.F.R. § 1502.20 ("Whenever a broad environmental impact statement has been prepared . . . the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement . . . ."). The agency's use of tiering allows it to fulfill its NEPA obligations while complying with the strict 30-day turnaround time OCSLA requires. *See* 43 U.S.C. § 1340(c)(1). Here, following its tiered analysis, MMS issued a "Finding of No Significant Impact" ("FONSI"), which is the agency's determination that the existing analyses are sufficient and a new, start-from-scratch EIS (or "revised" EA) is unnecessary. *See* 40 C.F.R. § 1508.9(a)(1).

The majority concludes MMS failed to include a sufficiently detailed analysis of the biological effects of Shell's exploration plan on bowhead whales, and that its order approving the plan was therefore arbitrary and capricious. The majority holds the agency should have prepared a new, self-

---

[10]The majority alternatively permits the agency to prepare a "revised" EA instead of a wholly new EIS. However, the majority does not explain how or whether its demand for a "revised" EA is analytically distinguishable from its demand for a new EIS. Further, whether the majority requires MMS to prepare a new EIS or a "revised" EA does not change the fact the agency gave the exploration plan a sufficiently "hard look" and so did not abuse its discretion by approving the exploration plan.

contained EIS (or "revised" EA) in response to Shell's exploration plan, rather than the two-lease EA it prepared, which tiered to the multi-sale EIS.

MMS conducted a thorough review to determine whether its two-lease EA was sufficient fully to analyze Shell's exploration plan. Pursuant to regulations, MMS considered the "significance" of Shell's proposal in terms of "context" and "intensity." *See* 40 C.F.R. § 1508.27. This means the agency considered, in relevant part: (1) whether, after a "hard look," Shell's exploration plan was likely to impact bowhead whales in a significant manner; (2) whether the likely consequences of the drilling plan were "highly controversial"; (3) whether the agency's identification of "cumulatively significant impacts" on bowhead whales required a separate EIS or different EA; and (4) whether Shell needed to identify the precise locations of each well it planned to drill. The majority holds each of these considerations requires the agency to produce a supplemental EIS or "revised" EA, and reverses the agency's order. For the reasons discussed below, with respect, the majority is in error. We should deny the petition.

### 1. MMS gave the potential effects of Shell's exploration plan on bowhead whales a "hard look."

The majority concludes MMS's analysis of the effect on bowhead whales of the proposed exploration plan was insufficient for the agency to approve the exploration plan without requiring a new, separate EIS (or "revised" EA) for each lease site because the agency did not give the plan a "hard look." We will find an agency gave an environmental issue a "hard look" under NEPA if the agency puts forth a " 'convincing statement of reasons' that explain why the project will impact the environment no more than insignificantly." *Ocean Advocates v. United States Army Corps of Eng'rs*, 402 F.3d 846, 864 (9th Cir. 2005). This "statement" may not be a mere conclusory assertion. *Id.*

The majority concludes the 1500-page multi-sale EIS and 100-page "tiered" EA it prepared were insufficient to constitute a "hard look" because—says the majority, not the expert agency—the EA and multi-sale EIS were too generalized to consider adequately the impact of Shell's planned activities on bowhead whales. According to the majority, it was not enough for the agency to analyze studies regarding the impact of the type of noise Shell's equipment would produce on bowhead whales as they swim by; in the majority's "expertise," the agency failed to analyze such vital additional noise-related consequences of drilling as the noise of two drillships with two icebreakers (versus the noise of two drillships with one icebreaker), and the noise of cracking ice.

Sitting en banc, we recently held in a similar case that, contrary to the majority's position, "it is not our proper role" to "make fine-grained judgments" about the weight of specific studies on which an environmental agency relies. *The Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008). Rather, "we are to be 'most deferential' when the agency is 'making predictions, within its area of special expertise, at the frontiers of science.' " *Id.*

In *Lands Council*, we affirmed a Forest Service plan to regrow an old-growth forest area against a challenge that contended the Forest Service failed to confirm its statistical modeling with long term, on-the-ground observation. We recognized that, "as non-scientists," we need only ensure the Forest Service analyzes the issue based on "studies that the agency, in its expertise, deems reliable." *Id.* at 994. In other words, we do *not* "assess[ ] the quality and detail" of the studies on which the agency relies. *Id.* at 993. Rather, "we . . . conduct a 'particularly deferential review' of an 'agency's predictive judgments about the areas that are within the agency's field of discretion and expertise as long as they are reasonable.' " *Id.* Our role is merely to ensure the agency has not: (1) "relied on factors which Congress has not intended it to consider," (2) "entirely failed to consider an important

aspect of the problem," or (3) "offered an explanation for its decision that runs counter to the evidence before the agency or an explanation that is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

None of these factors are present here. The documents MMS utilized in its analysis were comprehensive. The 1500-page multi-sale EIS contains a detailed analysis of icebreakers' potential effects on bowheads, and finds the effect of icebreaker noise on bowheads is likely to be "short-term" and not disruptive of migration patterns. The multi-sale EIS also contains a comprehensive 37-page analysis of all possible impacts from drilling and other oil and gas related activities on bowhead whales, reviewing studies on the biological significance of noise as it related to bowheads. The EIS notes "there has been no documented evidence that noise . . . would serve as a barrier to migration."

The EA, which was tiered to the multi-sale EIS, analyzed the biological significance of exploratory drilling on whales, with the advantage of knowledge of Shell's specific plans. It provided detailed information regarding the specific types of drilling and ice-management vessels Shell plans to use and how it intends to use them. All the studies to which they referred considered responses of bowhead whales to the noise from drillships along with noise from ice management vessels. The EA discussed icebreaker noise, the effect on bowheads of noise from drilling and ice management, and the National Marine Fisheries Service's conclusion that exploratory drilling and associated activities would not jeopardize bowhead whales, which it based in turn on an analysis of icebreaker and ice-management noise in addition to drilling noise. In fact, the EA conducted a noise analysis specific to the particular drilling vessels (the *Kulluk* and *Frontier Discoverer*) and the particular ice-breakers (the *Kapitan Dranitzyn* and *Vladimir Ignatyuk*) Shell plans to use.

The EA also requires Shell to measure and mitigate sound levels in specific operating environments. Specifically, the effects on bowhead whales will be carefully monitored through methods including aerial surveys; if there is any indication bowheads are being displaced from important habitats, the agency retains the authority to require Shell to modify its operations to prevent the threat of serious, irreparable harm to the whales.

If one substitutes the Forest Service's sufficient statistical modeling simulation in *Lands Council* for MMS's purportedly insufficient simulation of noise effects here, and the unnecessary on-the-ground observation by the Forest Service in *Lands Council* for the purportedly necessary on-site noise measurement here, one cannot help but conclude the panel majority here is overruling *Lands Council sub silentio*.

The majority holds simulations of noise effects on bowhead whales are not enough; the agency must actually go and measure the effect of noise on-site in an "uncontrolled setting." The EIS and EA studies that do exist, according to the majority, are insufficient because they involve two drillships with one icebreaker ship, and the situation here involves two icebreaker ships (nevermind the fact the agency analyzed the statistics for each of the two icebreaker ships Shell plans to use). And the agency's proposal to monitor the environmental effects of Shell's plan is not good enough; according to the majority's environmental "expertise," the agency should have mandated "alternative migration measures" or prepared a full EIS (or "revised" EA). This is precisely the analysis *Lands Council* rejected. *See* 537 F.3d at 1001 ("[T]o require [an environmental agency] to affirmatively present every uncertainty in an EIS would be an onerous requirement, given that experts in every scientific field routinely disagree; such a requirement might inadvertently prevent the [agency] from acting due to the burden it would impose.").

MMS gave a "hard look," by any stretch of the term, to whether Shell's plans would disrupt the bowhead whale's

migratory habits. The expert agency to which Congress delegated its authority concluded Shell's plan would not disrupt the bowhead whales to an extent necessary to require an additional costly EIS (or "revised" EA). The majority would replace the "hard look" standard with one that requires the agency to address every possible post-hoc consideration or eventuality. This not what the statute demands—"[N]one of NEPA's statutory provisions or regulations requires [an environmental agency] to affirmatively present every uncertainty in its EIS," *id.* at 1001—and such a rule would render impossible Congress's express requirement in OCSLA that the analysis be completed in 30 days. Thus, with respect, the majority's analysis is incorrect on this ground.

### 2. The potential effects identified in the multi-sale EIS and EA are not "highly controversial."

If a proposed exploration plan is "highly controversial," a new, site-specific EIS (or "revised" EA) may be required. 40 C.F.R. § 1508.27. The majority contends MMS erred by failing to prepare a site-specific EIS (or "revised" EA) due to "[t]he contentious nature of the agency's internal communication during the review process." This is based on a handful of complaints from a few agency scientists who opposed the agency's final determination.

A plan is "highly controversial," and thus in need of a new EIS (or "revised" EA), only if there is a "*substantial dispute*" about the "size, nature, or effect" of the proposed act—and not the mere "existence of opposition." *Native Ecosystems Council v. United States Forest Serv.*, 428 F.3d 1233, 1240 (9th Cir. 2005) (emphasis added). Internal disagreement alone is not enough to render an agency-approved plan "highly controversial," because "[w]hen specialists express conflicting views, we defer to the informed discretion of the agency." *Envtl. Prot. Info. Ctr. v. United States Forest Serv.*, 451 F.3d 1005, 1017 (9th Cir. 2006). As this court has explained, "[s]imply because a challenger can cherry pick information

and data out of the administrative record to support its position does not mean that a project is highly controversial . . . ." *Native Ecosystems Council*, 428 F.3d at 1240. "Not only would such a standard deter candid disclosure of negative information, it does not follow that the presence of some negative effects necessarily rises to the level of demonstrating a significant effect on the environment." *Id.*

Thus, that qualified experts may disagree about the importance of certain data does not necessarily create a substantial enough controversy to undermine the EIS or EA the agency prepared. Otherwise, "any information included in an EA and its supporting NEPA documents that admits impacts on wildlife species and their habitat would trigger the preparation of an EIS."[11] *Id.* Thus, this court has "decline[d] to interpret NEPA as requiring the preparation of an EIS any time that a federal agency discloses adverse impacts on wildlife species or their habitat or acknowledges information favorable to a party that would prefer a different outcome." *Id.*

Accordingly, the majority is incorrect that the agency's action was so "highly controversial" that preparation of an EIS was required. Indeed, the fact that the agency considered such dissenting views underscores what a "hard look" the proposal was given. *See id*. at 1241 ("A 'hard look' should, of course, involve the discussion of adverse impacts. A 'hard look' does not dictate a soft touch or brush-off of negative effects."). However, "such information does not automatically make the project 'highly controversial' . . . for the purposes of determining whether" a new EIS (or "revised" EA) is necessary. *Id.*

On the contrary, neither the majority nor the parties identify systemic failures in the agency's analysis, or any potential

---

[11]As discussed above, the majority has not analytically distinguished between its demand MMS prepare a new EIS or a "revised" EA.

effects it might avoid by the collection of more data. The agency did not err.

### 3.    There is no need for an EIS to analyze "cumulatively significant impacts."

The majority asserts a supplemental EIS (or "revised" EA) was necessary because "there is the potential for cumulatively significant impacts." "Cumulatively significant impacts" are environmental effects from multiple activities, each too small to create a disturbance, but that together create a measurable environmental effect.

Here, the multi-sale EIS, along with the EA, show the agency gave substantial consideration to the cumulative impacts from the proposed activities. Section V of the multi-sale EIS contains an 85-page discussion of cumulative impacts. Using a 5-step analysis, the multi-sale EIS: (1) identified "the potential effects of the Beaufort Sea *multiple* sale on the natural resources and human environment that may occur in the Beaufort Sea, on the North Slope, and along the oil-transportation route"; (2) "analyze[d] *other* past, present, and reasonably foreseeable future oil-development activity on the North Slope/Beaufort Sea . . . "; (3) "consider[ed] effects from *other* actions (sport harvest, commercial fishing, subsistence hunting, and loss of overwintering range, etc.)"; (4) "attempt[ed] to quantify effects by estimating the extent of the effects . . . and how *long* effects would last"; and (5) "weigh[ed] more heavily *other* activities that are more certain and geographically in the [zone nearest to shore] and . . . analyz[ed] more intensively those effects that are of greatest concern." (emphasis added). The EA updated the above-described analysis and included information on the potential effects from claimed global warming. The cumulative effects analysis considered the projected effects of oil development and production under all of the leases covered by the multi-sale EIS, past development and production, reasonably fore-

seeable development and production, and even speculative development and production prospects.

Relying on its previous cumulative impact analyses, the EA reasonably determined "the incremental contribution of the proposed activities to cumulative impacts is expected to be quite small, and thus not significant." The EA further observed that "[t]he activities proposed in [Shell's exploration plan] represent a small portion of the projected activities originally analyzed for a Beaufort Sea lease sale." As one agency scientist stated in an e-mail, because there is no new information to be discovered in an additional EIS, "[w]e do not need to reanalyze all cumulative impacts."

Accordingly, the EA and the documents to which it tiered articulated a careful and extensive cumulative effects analysis. The MMS reasonably concluded potential additional cumulative effects were not significant enough to require a costly and time-consuming new EIS (or "revised" EA), which would have made compliance with Congress's 30-day OCSLA approval mandate impossible.

    *4.   Shell did not need to specify the location of each drilling well prior to approval of its exploration plan.*

Shell's exploration plan included the locations of the four wells it planned to drill during the first of three years of drilling. The plan explained Shell intended to drill wells on additional prospects during the final two years of the plan. The precise location and extent of drilling in the final two years, however, depended in part on the resources found during the first year of drilling.[12] The majority incorrectly concludes OCSLA and its implementing regulations require Shell's exploration plan to include the specific locations of every well that will be drilled.

---

[12]This seems to make sense. Should the oil company commit to drill next to what turns out to be a dry well?

OCSLA requires that an exploration plan include, "in the degree of detail which the Secretary may by regulation require," among other things, "the *general location* of each well to be drilled." 43 U.S.C. § 1340(c)(3)(C) (emphasis added). The agency's regulations require an exploration plan that includes "[a] map showing the surface location and water depth of each proposed well and the locations of all associated drilling unit anchors." 30 C.F.R. § 250.211. Here, Shell knew of and proposed four wells "to be drilled," and provided a map with the required information for those four wells. This is sufficient under the regulation. The majority's demand Shell provide exact locations of wells before approval of its exploration plan, when those exact locations depend on what happens with the earlier wells which must be explored pursuant to the exploration plan, is a Catch-22.

Under the exploration plan approved by MMS, should Shell seek to drill at sites other than the four specified in its original exploration plan, it will need to obtain a permit to drill before doing so. 30 C.F.R. § 250.281(b). Likewise, all supplemental exploration plans the Regional Supervisor determines are likely to result in a significant change in the impacts previously identified and evaluated in the original exploration plan will be subject to the same procedures for approval as the original exploration plan. 30 C.F.R. § 250.285(c). Thus, Shell will be required to supplement its exploration plan with information regarding those additional drilling sites.[13]

The agency's interpretation of its own regulations to permit an entity to determine the exact location of future wells based on what it discovers in the first year of exploitation is consistent with the statute and its regulations and is entitled to substantial deference. *Thomas Jefferson Univ. v. Shalala*, 512

---

[13]Shell would also be required to submit a revised exploration plan if it proposes to "[c]hange the surface location of a well." 30 C.F.R. § 250.283(a)(2).

U.S. 504, 512 (1994); *see also Chevron USA, Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 843 (1984) ("We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer . . . ."). Any drilling beyond the specific sites approved in Shell's exploration plan would have to undergo separate MMS review pursuant to 30 C.F.R. § 250.413(h), which requires the applicant for a permit to drill to submit a report of conditions as the proposed site. Thus, the agency's decision not to require this information now, but instead to require it later when the information is available, was not arbitrary and capricious.

### *Conclusion*

In the statutorily required 30-day period MMS had to approve or deny Shell's request for an exploration permit, the agency parsed nearly 1,600 pages of in-depth scientific analysis. This voluminous study—a "hard look" by any rule—revealed that, while the drilling project might have some small impact on the environment, that impact was not significant enough for MMS to require a costly, time-consuming, duplicative EIS or "revised" EA. This analysis was neither arbitrary nor capricious, and is entitled to deference.

I'm afraid the majority has substituted its "expertise" in environmental science for that of the expert agency to which Congress entrusted primary analytic responsibility, and in the process has overruled an en banc decision and nullified Congress's express 30-day OCSLA approval requirement. We should not do any of this. Accordingly, for the reasons discussed above, I would hold we lack jurisdiction over NSB and REDOIL's untimely petitions for review, and that MMS's approval of Shell's exploration permit without an additional EIS or "revised" EA was not arbitrary and capricious.