**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NATIVE VILLAGE OF POINT HOPE;
ALASKA WILDERNESS LEAGUE;
CENTER FOR BIOLOGICAL DIVERSITY;
DEFENDERS OF WILDLIFE; NATURAL
RESOURCES DEFENSE COUNCIL;
NATIONAL AUDUBON SOCIETY, INC.;
NORTHERN ALASKA ENVIRONMENTAL
CENTER; OCEANA; PACIFIC
ENVIRONMENT; RESISTING
ENVIRONMENTAL DESTRUCTION ON
INDIGENOUS LANDS, REDOIL; SIERRA
CLUB; THE WILDERNESS SOCIETY,
INC.; GREENPEACE, INC.,
              *Petitioners,*

         v.

No. 11-72891

KENNETH LEE SALAZAR, Secretary
of the Interior; BUREAU OF OCEAN
ENERGY MANAGEMENT,
REGULATION AND ENFORCEMENT,
              *Respondents,*

STATE OF ALASKA; SHELL OFFSHORE,
        *Respondents-Intervenors.*

INUPIAT COMMUNITY OF THE ARCTIC
SLOPE,
                              *Petitioner,*

            v.

KENNETH LEE SALAZAR, Secretary
of the Interior; BUREAU OF OCEAN
ENERGY MANAGEMENT,
REGULATION AND ENFORCEMENT,
                              *Respondents,*

STATE OF ALASKA; SHELL OFFSHORE
INC.,
            *Respondents-Intervenors.*

No. 11-72943
OPINION

On Petition for Review of a Final Agency Action
Bureau of Ocean Energy Management

Argued and Submitted
May 15, 2012—Pasadena, California

Filed May 25, 2012

Before: Alex Kozinski, Chief Judge, Carlos T. Bea and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Ikuta

## COUNSEL

Holly A. Harris (argued), Earthjustice, Juneau, Alaska; Christopher Winter, Crag Law Center, Portland, Oregon, for petitioners Native Village of Point Hope, et al. and Inupiat Community of the Arctic Slope.

David C. Shilton (argued), U.S. Department of Justice, Washington, D.C., for respondent Ken Salazar, Secretary of the Interior, and Bureau of Ocean Management.

Kathleen M. Sullivan (argued), Quinn Emanuel Urquhart & Sullivan, LLP, New York, New York; Kyle W. Parker, Crowell & Moring LLP, Anchorage, Alaska, for respondent-intervenor Shell Offshore Inc., et al.

Rebecca Kruse, State of Alaska Department of Law, Anchorage, Alaska, for respondent-intervenor the State of Alaska.

## OPINION

IKUTA, Circuit Judge:

In these expedited petitions for review, we consider the allegations of Native Village of Point Hope et al. and Inupiat Community of the Arctic Slope (collectively, "petitioners") that the Bureau of Ocean Energy Management (BOEM) failed to discharge its obligations under the Outer Continental Shelf Lands Act (OCSLA) in approving Shell Offshore Inc.'s plan for exploratory oil drilling in the Beaufort Sea. We have jurisdiction pursuant to 43 U.S.C. § 1349(c), and we deny the petitions.[1]

I

This case is the latest chapter in a long-running saga beginning back in April 2002, when the Minerals Management Service (MMS)[2] established a five-year lease sale schedule for

---

[1]In a separate memorandum disposition filed concurrently with this opinion, we deny expedited petitions challenging BOEM's decision to approve an exploration plan for Shell Gulf of Mexico Inc. to drill for oil in the Arctic Ocean's Chukchi Sea. Because of the expedited nature of this case, no motions to stay the mandate will be granted. Petitions for rehearing and rehearing en banc may be filed with respect to this opinion.

[2]In May 2010, the Secretary of the Interior separated and reassigned the responsibilities of the former Minerals Management Service (MMS) to three separate divisions: the Bureau of Ocean Energy Management (BOEM), the Bureau of Safety and Environmental Enforcement (BSEE), and the Office of Natural Resources Revenue. DOI Secretarial Order No. 3299, sec. 8 (May 19, 2010). While the formal reorganization was underway, the Bureau of Ocean Energy Management, Regulation and Enforcement (BOEMRE), rather than MMS, functioned as the umbrella organization for the now-separated divisions. DOI Secretarial Order No. 3302 (June 18, 2010) (changing the name of MMS to BOEMRE). Although the Secretary's reorganization plan was not fully implemented until October 2011, *see* 76 Fed. Reg. 64,432 (Oct. 18, 2011), after the date of approval of Shell's exploration plan at issue here, we follow the parties' lead by referring to the regulatory divisions within BOEMRE as BOEM and BSEE throughout this opinion.

the outer continental shelf of Alaska. *Alaska Wilderness League v. Kempthorne*, 548 F.3d 815, 817-18 (9th Cir 2008), *vacated*, 559 F.3d 916 (9th Cir. 2009), *dismissed as moot sub nom. Alaska Wilderness League v. Salazar*, 571 F.3d 859 (9th Cir. 2009). Indeed, this is the third time the government has appeared before us to defend its approval of Shell's exploration plan against challenges by many of these same petitioners. We begin by describing the legal framework and factual background for these challenges.

A

In enacting the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. §§ 1331-1356a, Congress authorized the Secretary of the Interior to lease portions of the outer continental shelf to qualified bidders for the purpose of exploring and developing its oil and gas reserves. Under OCSLA, the Secretary begins by holding a lease sale to identify qualified bidders. *Id.* §§ 1337, 1344(a). Becoming the successful bidder in a lease-sale auction is merely the first step. Before undertaking exploration activities in the leased area, the winning bidder must obtain the Secretary's approval of an exploration plan, *id.* § 1340(c)(1), and obtain many other permits and approvals.[3] If, after completing such exploration activities, the leaseholder concludes there is potential for developing oil and gas reserves on the leased area, the leaseholder must obtain approval of a development and production plan, *id.* § 1351(a)(1), as well as obtaining a new round of permits and approvals before pursuing development of the leased area.

---

[3]The required permits include *inter alia* an approval of an oil spill response plan under the Clean Water Act, 33 U.S.C. § 1321, a National Pollutant Discharge and Elimination System (NPDES) permit under the Clean Water Act, *id.* § 1342, a dredge-and-fill permit under the Clean Water Act, *id.* § 1344, an air quality permit under the Clean Air Act, 42 U.S.C. § 7661a, a permit to drill, 43 U.S.C. § 1340, 30 C.F.R. § 250.1617, and a range of state approvals.

Only the exploration plan stage and the leaseholder's obligations under OCSLA are at issue here. In general, the applicable regulations require the leaseholder to submit specified information about its proposed exploration plan. 30 C.F.R. § 550.211-228. Within thirty days of the leaseholder's submission or last modification of the exploration plan, the Secretary "shall approve" the plan if it is consistent with OCSLA, its implementing regulations, and the applicable lease, 43 U.S.C. § 1340(c)(1), unless the Secretary determines that the proposed activity "would probably cause serious harm or damage to life . . ., to property, to any mineral . . ., to the national security or defense, or to the marine, coastal, or human environment," *id.* § 1334(a)(2)(A)(i), and that "such proposed activity cannot be modified to avoid such condition," *id.* § 1340(c)(1); *see also* 30 C.F.R. § 550.233.

While OCSLA focuses on development of the outer continental shelf, the Clean Water Act § 311, as amended by the Oil Pollution Act of 1990, focuses on the prevention of and response to oil spills. *See* 33 U.S.C. § 1321. Among other things, § 311 requires a leaseholder to submit an oil spill response plan, which is "a plan for responding, to the maximum extent practicable, to a worst case discharge, and to a substantial threat of such a discharge, of oil or a hazardous substance." *Id.* § 1321(j)(5)(A)(i). Offshore facilities "may not handle, store, or transport oil unless" the leaseholder's oil spill response plan "has been approved by the President" and the "facility is operating in compliance with the plan." *Id.* § 1321(j)(5)(F)(i)-(ii).

At the time Shell began its leasing and exploration efforts, MMS was in charge of conducting lease sales, reviewing exploration plans under OCSLA, and approving oil spill response plans under § 311 of the Clean Water Act. Following the Deepwater Horizon oil spill in the Gulf of Mexico in early 2010, the Secretary divided MMS's responsibilities among three new regulatory entities in order to separate the "three distinct and conflicting missions" of (1) promoting

resource development, (2) enforcing safety regulations, and (3) maximizing revenues from offshore operations. Press Release, U.S. Dep't of the Interior, Salazar Divides MMS's Three Conflicting Missions (May 19, 2010), *available at* http://www.doi.gov/news/pressreleases/Salazar-Divides-MMSs-Three-Conflicting-Missions.cfm; *see also* 76 Fed. Reg. 64,432; DOI Secretarial Order No. 3299. In the reorganization, the Secretary made BOEM responsible for managing the development of offshore resources, including approving a leaseholder's exploration plan under OCSLA and conducting an environmental analysis of that plan under the National Environmental Policy Act (NEPA). *See* 76 Fed. Reg. at 64,432. The Secretary made the Bureau of Safety and Environmental Enforcement (BSEE) responsible for enforcement of safety and environmental functions, including the oil spill response plan requirements in 30 C.F.R. pt. 254. *See* 76 Fed. Reg. at 64,448.[4] As the regulatory process now stands, BOEM and BSEE are independent entities with separate responsibilities.

B

Although a winning bidder in the Beaufort Sea lease sale in 2003, Shell has yet to commence exploration activities. In November 2006, Shell submitted an exploration plan for the Beaufort Sea region. *Alaska Wilderness League*, 548 F.3d at 818. MMS approved Shell's exploration plan in February 2007. *Id.* at 821. Some of the petitioners here, along with other groups, challenged MMS's approval, and a panel of this court issued a stay pending review, thereby preventing exploration in 2007 and 2008. *See id.* at 819-20. On November 20, 2008, the panel vacated and remanded MMS's approval. *See id.* at 835. After Shell filed a petition for rehearing en banc, we issued an order vacating and withdrawing the panel opinion. *See Alaska Wilderness League*, 559 F.3d at 916. Shortly

---

[4]The Office of Natural Resource Revenue was made responsible for revenue collection.

thereafter, Shell withdrew its exploration plan, and in 2009 we granted Shell's motion to dismiss the petitions as moot. *See Alaska Wilderness League*, 571 F.3d at 859. In June 2009, Shell submitted a new exploration plan that proposed drilling at the Sivulliq and Torpedo prospects in the Beaufort Sea. MMS approved that plan, and in May 2010 we denied expedited petitions challenging that approval. *See Native Vill. of Point Hope v. Salazar*, 378 F. App'x 747, 748 (9th Cir. 2010) (mem.). Drilling did not commence, however, because soon after the approval the federal government suspended all drilling exploration activities in the Arctic in response to the Deepwater Horizon oil spill. U.S. Dep't of the Interior, Decision Memorandum Regarding the Suspension of Certain Offshore Permitting and Drilling Activities on the Outer Continental Shelf, July 12, 2010, at 1, *available at* http://www.doi.gov/deepwaterhorizon/upload/Salazar-Bromwich-July-12-Final.pdf.

In May 2011, after the Secretary lifted the moratorium on drilling, Shell submitted a revised exploration plan to BOEM and a revised oil spill response plan to BSEE.[5] In the revised exploration plan, Shell proposed drilling two wells at its Sivulliq prospect and two wells at its Torpedo prospect in the Beaufort Sea during the July 10 to October 31 drilling season. On August 3, 2011, after conducting a NEPA review of the drilling activities contemplated in the revised exploration plan, BOEM issued a Finding of No Significant Impact. The agency concluded "that no substantial questions remain

---

[5]Among other things, Shell's revisions responded to two Notices to Lessees issued by the Secretary of the Interior in 2010 after the Deepwater Horizon incident. One notice required leaseholders to include additional information in the worst case discharge scenarios of their exploration plans and development plans, *see* NTL No. 2010-N06 (June 18, 2010). The other informed leaseholders that BSEE would evaluate "whether each operator has submitted adequate information demonstrating that it has access to and can deploy containment resources that would be adequate to promptly respond to a blowout or other loss of well control," *see* NTL No. 2010-N10 (Nov. 8, 2010).

regarding potentially significant impacts and that no potentially significant impacts are expected to occur as a result of the proposed activities." Petitioners do not challenge these conclusions. On August 4, 2011, BOEM approved Shell's revised exploration plans subject to eleven conditions. Conditions 8 and 9 require Shell to make certain technical demonstrations concerning its oil spill response capabilities to BSEE before beginning exploratory drilling operations. BSEE approved Shell's revised oil spill response plan on March 28, 2012.[6]

In these expedited petitions, petitioners challenge BOEM's approval of Shell's revised exploration plan. Petitioners claim that BOEM erred in approving the plan for three reasons. First, they claim that Shell's revised exploration plan did not meet the informational standards set by OCSLA and the regulations, because (1) it failed to reference an approved oil spill response plan as required by 30 C.F.R. § 550.219(a) and (2) did not contain an adequate description of Shell's well-capping stack and containment system as required by 30 C.F.R. § 550.213(d).[7] Second, they claim that BOEM erred by failing to reconcile conflicting evidence regarding the feasibility of well-capping technology and the amount of time it takes to drill a relief well in the event of a well blowout and oil spill. Finally, they claim that BOEM erred by approving the revised exploration plan subject to conditions.

---

[6]We take judicial notice of this approval. *See Interstate Nat'l Gas Co. v. S. Cal. Gas Co.*, 209 F.2d 380, 385 (9th Cir. 1954). We also grant the parties' motions for judicial notice of briefs filed in *Native Village of Point Hope*, 378 F. App'x at 747.

[7]Shell's proposed well-capping stack and containment system involves "subsea devices used on the top of the well" that will either seal the well or divert the flow from the well to a surface vessel with a containment system equipped for separation and disposal of hydrocarbons.

II

BOEM's decision "to approve, require modification of, or disapprove any exploration plan" is "subject to judicial review only in a United States court of appeals for a circuit in which an affected State is located." 43 U.S.C. § 1349(c)(2). The reviewing court "shall consider the matter under review solely on the record made before the Secretary," and BOEM's findings, "if supported by substantial evidence on the record considered as a whole, shall be conclusive." *Id.* § 1349(c)(6). In addition to the standard of review established by OCSLA, BOEM's approval of an exploration plan is a final agency action subject to review under § 706 of the Administrative Procedure Act (APA). Under this standard, we may set aside BOEM's approval only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Review under the arbitrary and capricious standard is deferential. We will not vacate an agency's decision unless it has "relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation [for that decision] that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc) (internal quotation marks omitted) (quoting *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1157 (9th Cir. 2006), *overruled on other grounds as recognized by Am. Trucking Ass'ns v. City of L.A.*, 559 F.3d 1046, 1052 (9th Cir. 2009)). We have emphasized that deference to the agency's decisions "is especially warranted when 'reviewing the agency's technical analysis and judgments, based on an evaluation of complex scientific data within the agency's technical expertise.' " *Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701, 707 (9th Cir. 2009) (quoting *Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 869 (9th Cir. 2003)).

While OCSLA gives appellate courts jurisdiction over challenges to BOEM's approval of an exploration plan, BSEE's

decisions regarding oil spill prevention, response, and liability are committed to a separate review process in the district court. *See* 33 U.S.C. § 1321(n). We have interpreted § 1321(n) as a grant of exclusive original jurisdiction to the district court to review an oil spill response plan. *Edwardsen v. U.S. Dep't of the Interior*, 268 F.3d 781, 790-91 (9th Cir. 2001) ("OCSLA regulations, the special review statute contained in OPA, and the overall regulatory regime created by OPA all make it clear that jurisdiction lies in the district court for actions challenging approval of a spill response plan or modifications to such a plan.").

### III

We begin by considering petitioners' claim that BOEM erred in approving Shell's exploration plan because the plan did not include all the information required under OCSLA and the implementing regulations. Petitioners point to two alleged errors: first that the exploration plan did not meet the requirements for informing BOEM about its oil spill response plan, and second that the exploration plan's discussion of its proposed well-capping stack and containment system was incomplete. We discuss each issue in turn.

### A

Petitioners first claim that BOEM's approval of Shell's exploration plan was arbitrary and capricious because the plan failed to comply with the regulatory requirement that an exploration plan include a "[r]eference" to an approved regional oil spill response plan, as well as "a comparison of the appropriate worst case discharge scenario in [the applicant's] approved regional [oil spill response plan] with the worst case discharge scenario that could result from [the applicant's] proposed exploration activities." 30 C.F.R. § 550.219(a)(2), (iv).[8]

---

[8]Section 550.219 provides:

  The following information regarding potential spills of oil (see

In response to this requirement, Shell's exploration plan stated, "Shell's Beaufort Sea Regional Exploration [Spill Plan] was unconditionally approved on 11 March 2010 and is a fundamental component for the planned exploration drilling program. The latest revision . . . has been submitted to [BSEE] as a separate document." The exploration plan then compared the worst case scenario for its exploration activities to the worst case scenario in the revised oil spill response plan submitted to BSEE. While the exploration plan "reference[d]" the approved 2010 spill plan, it did not make worst case dis-

---

definition under 30 CFR 254.6) and hazardous substances (see definition under 40 CFR part 116) as applicable, must accompany your EP:

(a) Oil spill response planning. The material required under paragraph (a)(1) or (a)(2) of this section:

(1) An Oil Spill Response Plan (OSRP) for the facilities you will use to conduct your exploration activities prepared according to the requirements of 30 CFR part 254, subpart B; or

(2) Reference to your approved regional OSRP (see 30 CFR 254.3) to include:

    (i) A discussion of your regional OSRP;

    (ii) The location of your primary oil spill equipment base and staging area;

    (iii) The name(s) of your oil spill removal organization(s) for both equipment and personnel;

    (iv) The calculated volume of your worst case discharge scenario (see 30 CFR 254.26(a)), and a comparison of the appropriate worst case discharge scenario in your approved regional OSRP with the worst case discharge scenario that could result from your proposed exploration activities; and

    (v) A description of the worst case discharge scenario that could result from your proposed exploration activities (see 30 CFR 254.26(b), (c), (d), and (e)).

Shell did not attach a copy of a facility-specific oil spill response plan to its exploration plan under 30 C.F.R. § 550.219(a)(1). It therefore must satisfy the alternate requirements of § 550.219(a)(2).

charge comparisons based on that spill plan as required by 30 C.F.R. § 550.219(a)(2)(iv). Rather, the exploration plan's worst case discharge comparisons were based on the estimated discharge in the revised spill plan, which was still undergoing review.

**[1]** Nevertheless, BSEE's approval of the revised spill response plan on March 28, 2012, renders petitioners' challenge to this inconsistency in the exploration plan moot. "The basic question in determining mootness is whether there is a present controversy as to which effective relief can be granted." *Nw. Envtl. Def. Ctr. v. Gordon*, 849 F.2d 1241, 1244 (9th Cir. 1988). We have held that challenges to prior biological opinions for river hydropower system operations became moot upon issuance of superseding biological opinions because we could no longer grant effective relief as to the now non-operative biological opinions. *See Am. Rivers v. Nat'l Marine Fisheries Serv.*, 126 F.3d 1118, 1124 (9th Cir. 1997); *Idaho Dep't of Fish & Game v. Nat'l Marine Fisheries Serv.*, 56 F.3d 1071, 1074-75 (9th Cir. 1995). We are faced with a similar situation: Shell's revised spill plan was approved in 2012, and therefore Shell's exploration plan now references and makes the required worst case discharge scenario comparison to an approved spill plan. The informational requirements of 30 C.F.R. § 550.219(a)(2) are satisfied, and there is no relief we can now provide petitioners to redress their concerns.

We also reject petitioners' argument (which is, in any event, waived because it was raised for the first time at oral argument) that Shell amended its oil spill response plan after submitting it to BSEE, and that therefore the spill plan approved by BSEE included different oil spill trajectories, equipment, fleet size, and techniques than did the spill plan discussed in the exploration plan. Given that petitioners conceded at oral argument that Shell's amendments to the approved 2012 spill plan did not change the worst case discharge numbers discussed in the exploration plan, these dif-

ferences are not relevant, and therefore this argument also
fails.

**[2]** In light of BSEE's approval of Shell's revised plan in
March 2012, we dismiss petitioners' claim as moot.

B

**[3]** We next consider petitioners' assertion that BOEM
erred in approving Shell's exploration plan because the plan
included a well-capping stack and containment system as part
of its proposed response to oil spills, but did not provide all
the information required under the OCSLA regulations. Spe-
cifically, 30 C.F.R. § 550.213(d) requires an exploration plan
to include "[a] description and discussion of any new or
unusual technology (see definition under § 550.200) you will
use to carry out your proposed exploration activities."[9] The
regulations define "new or unusual technology" to include
equipment or procedures that "[h]ave not been used previ-
ously or extensively in a BOEM OCS Region," "[h]ave not
been used previously under the anticipated operating condi-
tions," or "[h]ave operating characteristics that are outside the
performance parameters established by this part." 30 C.F.R.
§ 550.200. Neither OCSLA nor its implementing regulations
define the term "description and discussion" or explain the
level of specificity necessary to satisfy the regulation's

_____

[9]Section 550.213(d) provides:

   The following general information must accompany your EP: . . .

   (d) New or unusual technology. A description and discussion of
   any new or unusual technology (see definition under § 550.200)
   you will use to carry out your proposed exploration activities. In
   the public information copies of your EP, you may exclude any
   proprietary information from this description. In that case,
   include a brief discussion of the general subject matter of the
   omitted information. If you will not use any new or unusual tech-
   nology to carry out your proposed exploration activities, include
   a statement so indicating.

requirement to provide "general information," *see id.* § 550.213(d), thus leaving it to BOEM to determine whether the information provided is sufficient. *See* 43 U.S.C. § 1340(c)(1); *Lands Council*, 537 F.3d at 1000.

**[4]** We agree that the well-capping stack and containment system described in Shell's exploration plan meets the definition of new and unusual technology because the system has never been used in BOEM's Alaska region or in Arctic drilling conditions. *See* 30 C.F.R. § 550.200. Nevertheless, we reject petitioners' argument that BOEM was arbitrary and capricious in approving the plan, because BOEM could reasonably conclude that the exploration plan provided an adequate description and discussion of the technology. The exploration plan's seven-paragraph explanation of the well-capping stack and containment system included a description of the design (blowout preventer equipped with spacer spools and rams for pumping kill weight fluid into the well, with all equipment designed for conditions found in the Arctic), proposed location (warm-stored aboard a designated vessel in Alaska), and planned implementation of the technology. Given the deference we owe BOEM's interpretation of its own regulations, we cannot say that BOEM acted arbitrarily or capriciously in concluding that this description and discussion satisfied the informational requirements of 30 C.F.R. § 550.213(d). *See Auer v. Robbins*, 519 U.S. 452, 461 (1997) (an agency's interpretation of its own regulations is "controlling unless 'plainly erroneous or inconsistent with the regulation' " (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359 (1989))).[10]

---

[10]To the extent petitioners are making the more substantive argument that BOEM erred by failing to analyze the technical feasibility of the well-capping stack and containment system, their argument fails. BOEM's review does not extend to such issues, which are considered by BSEE when reviewing and approving Shell's oil spill response plan, *see* 30 C.F.R. part 254, and application for permit to drill, *id.* § 250.417. *See Edwardsen*, 268 F.3d at 790 (declining to review the substantive adequacy

IV

We next turn to petitioners' argument that BOEM erred in approving the exploration plan because the agency did not explain how it reconciled inconsistencies in Shell's 2011 plan regarding the feasibility of the proposed well-capping stack and containment system and the time for drilling a relief well.

A

Petitioners first argue that BOEM erred in not explaining how it reconciled Shell's statements in its pre-2011 oil spill response plans that "proven technology is not available" for well capping and "well capping would not be an effective option for regaining well control while operating from a moored vessel," with its statement in the 2011 exploration plan that "subsea capping equipment and containment capabilities . . . would be implemented if all other kick control methods fail." We disagree.

**[5]** First, there is no statutory or regulatory requirement that BOEM include a statement identifying and reconciling inconsistent positions taken by a permit applicant. Nor does BOEM's failure to do so make its approval of the exploration plan arbitrary and capricious under the APA. While an agency must present an adequate explanation for a decision that contradicts the agency's previous decision, *see, e.g.*, *Humane*

of an oil spill response plan because jurisdiction for such review resides in the district court in the first instance). For the same reason, we reject petitioners' contention that BOEM's approval of the exploration plan contravenes 30 C.F.R. § 250.107(c), which requires use of the best available and safest technology (BAST). BSEE, not BOEM, is tasked with ensuring BAST compliance, and we lack jurisdiction to review BSEE's technical analyses. See 76 Fed. Reg. at 64,435 (stating that 30 C.F.R. § 250.107 "establishes the expectations for operators to protect health, safety, and the environment, [and] these responsibilities fall under the authority of BSEE").

*Soc'y v. Locke*, 626 F.3d 1040, 1058 (9th Cir. 2010), BOEM did not adopt Shell's past statements, and therefore the agency is not taking an inconsistent position. Rather, it is Shell, not BOEM, that reassessed the feasibility of a well-capping stack and containment system in light of new information, namely that "[w]ell capping techniques have improved, especially since [their] frequent application during the Iraq-Kuwait conflict in the early 1990s, and the recent Macondo [Deepwater Horizon oil spill] incident." Because OCSLA requires industries to adopt the best available and safest technology, 30 C.F.R. § 250.107(c); H.R. Rep. No. 95-590, at 97 (1977), *reprinted in* 1978 U.S.C.C.A.N. 1450, which would include technological advances, Shell's reassessment is consistent with the regulatory scheme.

**[6]** More important, BOEM's failure to expressly address Shell's changed position on well-capping technology does not cast doubt on BOEM's decision that the activities in the exploration plan will not "probably cause serious harm or damage to life (including fish and other aquatic life), to property, . . . or to the marine, coastal, or human environment." *See* 43 U.S.C. §§ 1334(a)(2)(A)(i), 1340(c)(1); *see also* 30 C.F.R. §§ 550.202, 550.233. First, the well-capping stack and containment system challenged by petitioners is not the sole means identified in the exploration plan for responding to a well blowout and oil spill. Rather, Shell has several response tools at its disposal, including surface control options and relief well capabilities. As BOEM reasonably concluded, "Shell's proposed subsurface collection system will be an added tool for responding to a potential well control incident where fluids flow and will increase response preparedness, but is not necessary or required to comply with" the regulations. Second, BOEM's conclusion that well-capping technology is now feasible in the Arctic is supported by substantial evidence in the record. *See* 43 U.S.C. § 1349(c)(6). BOEM found that "[s]ubsea containment technology has been successfully used in the past," including by Shell at the NaKika and Mars sites and by British Petroleum during the Deepwater

Horizon spill, and that "most major components for such a system are available and have been field tested." Whether well-capping technology is now feasible in the Arctic is a technical issue that lies squarely within the agency's scientific expertise and, therefore, is accorded great deference by a reviewing court. *See Ctr. for Biological Diversity*, 588 F.3d at 707; *see also Lands Council*, 537 F.3d at 993 ("[Courts] are not free to impose on the agency [their] own notion of which procedures are best or most likely to further some vague, undefined public good. Nor may [courts] impose procedural requirements not explicitly enumerated in the pertinent statutes." (internal citations, alterations, and quotation marks omitted)). Accordingly, we conclude that the inconsistency in Shell's prior statements does not invalidate BOEM's approval of Shell's current exploration plan.

## B

We apply similar reasoning to petitioners' contention that BOEM acted arbitrarily and capriciously when it approved the exploration plan without reconciling evidence in the record that runs contrary to Shell's estimate of the time necessary to drill a relief well. Petitioners argue that Shell's estimate for the time it will take to drill the planned production wells is far longer than its estimate for the time it will take to drill an emergency relief well, and they further argue that Shell "failed to provide the agency any rational explanation for why it expects to drill a relief well so much faster."[11]

[7] We reject petitioners' contention that BOEM acted arbitrarily by failing to state on the record how it reconciled these different estimates. As noted above, there is no require-

---

[11]Specifically, Shell estimated that it would take 44 days to drill the planned wells at its Torpedo prospect but only 25 days to drill an emergency well at the Torpedo site, and that it would take 34 days to drill the planned wells at its Sivulliq prospect, but only 20 days to drill a relief well at the site.

ment that BOEM do so. Moreover, BOEM's decision to rely on Shell's time estimate for drilling relief wells was "supported by substantial evidence on the record considered as a whole" and is therefore "conclusive." 43 U.S.C. § 1349(c)(6). The well control plan submitted as a part of Shell's exploration plan explained that it would take a shorter time to drill relief wells than to drill exploratory wells because "[r]elief well drilling is rapid," relief wells "intercept a deep blowout at some point above the total vertical depth," which saves time, and in an emergency situation "all available resources are quickly accessed and funneled into drilling the relief well and killing the blowout as quickly as possible." BOEM's conclusion that Shell provided a realistic estimate of the time it would take to drill a relief well is a technical issue that lies squarely within the agency's scientific expertise and is therefore entitled to "great deference." *Ctr. for Biological Diversity*, 588 F.3d at 712.

V

**[8]** Finally, we consider petitioners' argument that BOEM acted arbitrarily by approving Shell's exploration plan on the condition that Shell provide additional information about the "procedures for deployment, installation[,] and operation of the system under anticipated environmental conditions." This argument likewise fails. As noted above, BOEM must approve an exploration plan that is consistent with OCSLA and its implementing regulations unless the proposed activity will "probably cause serious harm or damage to life (including fish and other aquatic life), to property, . . . or to the marine, coastal, or human environment." 43 U.S.C. §§ 1334(a)(2)(A)(i), 1340(c)(1); *see also* 30 C.F.R. § 550.233. BOEM takes the position that after approving a plan, it may still "require [the applicant] to meet certain conditions, including those to provide monitoring information." 30 C.F.R. § 550.233(b)(1).[12] According to BOEM, its approval here fol-

---

[12]Section 550.233(b)(1) provides that within thirty days of the exploration plan's submission or last modification,

lowed this path: BOEM concluded that Shell's exploration plan complied with applicable requirements and would not cause serious harm or damage to the environment, but nevertheless required Shell to provide further documentation of its well-capping stack and containment system, as well as to meet certain additional conditions. This interpretation by BOEM of its own regulations is controlling unless plainly erroneous or inconsistent with the regulation. *Auer*, 519 U.S. at 461. Further, the conditions at issue here, which require Shell to seek additional authorizations before commencing drilling, are consistent with the statutory scheme's requirement that a leaseholder with an approved exploration plan obtain a permit to drill and other approvals that "conform to the activities described in detail in [the] approved [exploration plan]" before conducting exploration activities. 30 C.F.R. § 550.281; *see also* 43 U.S.C. § 1340(d). For these reasons, petitioners' argument that BOEM impermissibly conditioned its approval is without merit.

## VI

**[9]** The Secretary's recent division of MMS's responsibilities between BSEE and BOEM makes it clear that BOEM's duty here is limited. Within the thirty days provided by statute, BOEM had to determine whether Shell's exploration plan complied with OCSLA's requirements and would not "probably cause serious harm or damage" to life, property or the human, marine, or coastal environment. 43 U.S.C. §§ 1334(a)(2)(A)(i), 1340(c)(1); *see also* 30 C.F.R.

---

the Regional Supervisor will take one of the following actions:

The regional supervisor will (1) approve your EP, [i]f [i]t complies with all the applicable requirements, [a]nd then [t]he Regional Supervisor will notify you in writing of the decision and may require you to meet certain conditions, including those to provide monitoring information.

(ellipses omitted).

§§ 550.202, 550.233. Here, BOEM's decision that Shell's exploration plan complied with OCSLA's requirements is entitled to deference and is supported by the record as a whole. We deny the expedited petitions.[13]

   **DENIED.**

---

[13]Because we deny the expedited petitions, we do not reach petitioner's argument regarding whether a proper remedy for a deficiency is vacatur or remand.